**Thomas E. FOSTER and Georgia Lee Foster, Plaintiffs,**

v.

**CITY OF DETROIT, MICHIGAN, Defendant.**

**Civ. No. 21904.**

United States District Court E. D. Michigan, S. D.

June 10, 1966.

Elvin H. Wanzo, Detroit, Mich., for plaintiffs.

Robert Reese, Corp. Counsel, Edward M. Welch, William Dietrich, Geraldine B. Ford, Asst. Corp. Counsel, Detroit, Mich., for defendant.

## OPINION

KAESS, District Judge.

This is a class action under rule 23(a) (3) of the Federal Rules of Civil Procedure brought by the named plaintiffs, Thomas E. Foster and Georgia Lee Foster, in behalf of themselves and other property owners similarly situated. It arises out of condemnation proceedings instituted by the City of Detroit, Michigan, in the state court in 1950 against certain property in the city.

On August 16, 1962, this court issued an order dismissing the action for lack of jurisdiction. This order was reversed by the Court of Appeals for the Sixth

Circuit and the case remanded to this court with directions to take jurisdiction in the matter and hear and decide the case on its merits. Foster v. Herley, 330 F.2d 87 (6th Cir. 1964). The Circuit Court held that jurisdiction exists under Section 1331, Title 28, United States Code [1], as the plaintiffs seek to enforce a right which has its origin in the Constitution of the United States, which right will be supported if the Constitution is given one construction and will be defeated if the Constitution is given another construction. Foster v. Herley, supra, page 91.

■ The question of the jurisdiction of this court over the subject matter of the action has again been raised by defendant and has been argued extensively, both orally and in the briefs filed by counsel for the respective parties. [2] This court finds these arguments to be, not only repetitious, but irrelevant. The Court of Appeals has directed this court to take jurisdiction and hear the case on its merits. This conclusively settles the question in this court of its jurisdiction of the litigation. Sherwin v. Welch, 319 F. 2d 729 (D.C.Cir. 1963); Paull v. Archer-Daniels-Midland Co., 313 F.2d 612 (8th Cir. 1963). Deauville Associates v. Murrell, 180 F.2d 275 (5th Cir.), cert. denied, 340 U.S. 821, 71 S.Ct. 54, 95 L.Ed. 603, rehearing denied, 340 U.S. 893, 71 S.Ct. 204, 95 L.Ed. 648 (1950); A. M. Webb & Co. v. Robert P. Miller Co., 176 F.2d 678 (3rd Cir. 1949). It is now incumbent upon this court to pass upon the merits of the case.

Although the proofs presented by both parties to the action are not as complete as is normally desirable, the court finds the facts to be as follows.

On February 7, 1949, the Detroit Housing Commission, in anticipation of favorable public housing legislation by the 81st Congress of the United States, recommended to the Common Council of the City of Detroit that certain vacant land sites and certain slum clearance sites be approved as proposed public housing sites. The slum clearance sites included an area bounded generally by Waterloo, Chene, Larned and Dequindre Streets, and known as the "Mich. 1–11" area. [3] On February 14, 1949 the Common council approved these recommendations as a basis for the preparation of applications for federal loan contracts for 14,350 public housing units, and directed the Corporation Counsel for the City of Detroit to prepare and submit to the Council for approval the proper resolutions for the condemnation of these sites, directed the Department of Buildings and Safety Engineering to refer to the Council all applications for building permits in these sites, and provided that any protests received in relation to any of these sites would be referred to the City Plan Commission for public hearings and further report prior to action by the Council. [4]

1. "The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

2. Defendant's main contention is that plaintiffs had an adequate remedy in the state courts, either in the original condemnation proceeding, the later condemnation proceeding, or in an original action, and that having failed to pursue these state remedies plaintiffs cannot now look to the federal court for redress. Plaintiffs, in turn, contend that there is no adequate remedy available to them in Michigan for damage caused by abuse of the power of eminent domain.

3. Studies leading to selection of this area for public housing purposes were begun in 1948. Answer to Interrogatories for City Plan Commission, paragraph 5.

4. Journal of the Common Council, p. 380. A total of 7 cases were brought pursuant to this resolution: Case #2071 (June 7, 1950); Case #2072 (June 7, 1950); Case #2073 (June 7, 1950); Case #2077 (June 19, 1950); Case #2109 (April 10, 1951); Case #2119 (June 27, 1951); Case #2129 (August 21, 1951).

On June 7, 1950, pursuant to a resolution adopted by the Common Council on April 25, 1950 [5], the Corporation Counsel filed a petition in Recorder's Court (Condemnation Case No. 2073) for the acquisition of property in the City of Detroit bounded by Dequindre (Grand Trunk Railroad Right of Way), Chene, Macomb and Clinton Streets, part of the "Mich. 1–11 area". A lis pendens was filed with the Register of Deeds for Wayne County, and form letters advising that condemnation was about to be started were sent out to plaintiffs and all other persons having an interest in properties in the area.

Subsequently, a petition and an order consolidating and regrouping the various parcels to be condemned were filed pursuant to a resolution adopted by the Common Council on September 29, 1953, ordering such regrouping. On June 1, 1954 the City of Detroit acquired by condemnation the area bounded by St. Aubin, Chene, Madison and Mullett Streets, which was part of the area known as "Mich. 1–11".[6] However, no public housing was ever built on this site or any sites in the "Mich. 1–11" area, as the Detroit Housing Commission was never able to reach an agreement with the Public Housing Administration on the type of structures or labor costs therefor. In 1955 the Federal Housing Administration issued a stop order prohibiting further action.[7] On June 16, 1960, a motion and order discontinuing the petitions for acquisition of property and lis pendens filed in the pending cases were filed

as authorized by the Common Council on May 31, 1960.[8]

Meanwhile, on November 18, 1959 the Detroit City Plan Commission approved the submittal of an application to the Urban Renewal Administration for Elmwood Park Rehabilitation Project #1, located in the area generally bounded by Vernor, Chene, Lafayette and the Grand Trunk Railroad, which encompassed the altered "Mich. 1–11" site.[9] On January 13, 1961 the development plan for this project was approved. On May 3, 1961, the City Plan Commission approved submission of a planning application to the Urban Renewal Administration for Elmwood Park Rehabilitation Project #2 for the area bounded by Lafayette, Elmwood, Jefferson, and the Grand Trunk Railroad, which encompassed part of the original "Mich. 1–11" site. Condemnation proceedings were again instituted in the Recorder's Court against the property in the "Mich. 1–11" area, which as of now has been completely cleared.[10]

The named plaintiffs, Thomas E. and Georgia L. Foster, during the period in question owned 3 parcels of land located in the "Mich. 1–11" area, on St. Aubin, between Macomb and Clinton Streets. Lot 30 at 1312 St. Aubin contained a two-story frame dwelling with an apartment on each floor. Lot 28 at 1304 St. Aubin contained a brick building with a store downstairs and an apartment upstairs. In between these parcels was lot 29, a vacant lot.[11]

5. Journal of the Common Council, p. 1014–1034.

6. Condemnation cases #2109 and #2129.

7. There is no document on file verifying this order or giving the precise date thereof. However, as both parties apparently acknowledge its existence, it is accepted as a fact.

8. Journal of the Common Council, p. 975.

9. On April 18, 1950 (Journal of the Common Council, page 935) the Common Council added the block bounded by Waterloo, St. Aubin, Sherman and Chene. On August 12, 1952 the Common Council deleted the block bounded by Congress,

St. Aubin, Larned and the Grand Trunk Railroad (Journal of the Common Council, p. 1901). On January 2, 1957 the Common Council deleted the block bounded by Waterloo, St. Aubin, Joy and the Grand Trunk Railroad, and the 14 blocks remaining in the area bounded by Macomb, Chene, Larned and the Grand Trunk Railroad (Journal of the Common Council, p. 2748).

10. Case #2450, commenced Nov. 11, 1961; Case #2451, commenced Feb. 2, 1962; Case #2452, commenced April 4, 1962.

11. These three parcels were lots 28, 29 and 30 of the William B. Wesson's Subdivision of Lot 21, St. Aubin Farm, De-

The plaintiffs received a letter in August of 1949 informing them of the city's interest in condemning their property and requesting that they attend a meeting at the city hall. At this meeting, attended by approximately 200 persons, no objections to the condemnation were heard and those attending were told that they would be further notified at a later date. In the spring of 1950 the plaintiffs received a letter from the office of the corporation counsel, notifying them of the initiation of condemnation proceedings and requesting them to fill out a questionnaire relating to the ownership of the property and directing them to see the Director of Real Estate, 945 Griswold Building in Detroit, if they had any questions. Some time after receiving this letter, plaintiff Thomas Foster went to the Griswold Building, where he discussed the matter with a person he understood to be the official named in the letter, who told him that plaintiffs were not to improve their property in an attempt to get more money from the city and that plaintiffs would be notified when the property was to be taken. Plaintiffs' property was never taken under the action filed in 1950, which was discontinued in 1960.

In 1949 plaintiffs were renting both floors of each of these dwellings, receiving $50.00 for each of the upper apartments and $55.00 for each of the lower apartments. Some time in 1949, plaintiffs received a notice of certain building code violations and spent $1,700.00 to make the building at 1312 St. Aubin conform to building and safety regulations.

Plaintiffs' property was occupied from 1950–1954 for approximately the same rentals as plaintiffs were receiving in 1949. However, after 1954 when the several blocks adjacent to plaintiffs' property were condemned and razed by the city, plaintiffs were unable to obtain tenants. The property at 1304 was never occupied after that time. The upper flat at 1312 was rented until September of 1956, and for a short time thereafter was occupied by a non-paying tenant. After 1954 the buildings deteriorated rapidly. The dwelling at 1304 was broken into and damaged so often from 1954 to 1958 that the police finally refused to investigate. The boards over the doors and windows were repeatedly torn off, the plumbing and wiring were ripped out, and anything movable was carried away. Similar vandalization of the building at 1312 occurred during 1957 and 1958. After 1955 plaintiffs were unable to obtain insurance on the property at 1312 and in 1954–56 were able to insure the property at 1304 only at a rate 1½ times that charged in 1951. On July 16, 1958 plaintiffs received notices from the Detroit Department of Building and Safety Engineering that the buildings were dangerous and had to be put in a safe condition or be torn down. After several unsuccessful attempts to have the city demolish the buildings and deduct the cost from the eventual condemnation award, plaintiffs paid a private contractor $1,500.00 to tear them down.

After the buildings were demolished plaintiffs owned three vacant lots. In 1961 condemnation proceedings were again initiated against plaintiffs' property, and on February 2, 1963 plaintiffs received $5,200.00, which valuation defendant admits to be the fair cash market value thereof at the time the property was acquired.[12]

Plaintiffs contend that the City of Detroit denied them the due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States by depriving them of their property without just compensation. They assert that the city deprived them

troit, Wayne County, Michigan. The parcel at 1312 St. Aubin was purchased on December 6, 1940 for $4,500.00. The parcel at 1304 St. Aubin was purchased on a land contract in April of 1944 for $6,000.00, the deed passing on July 3, 1954. The vacant lot, located between 1304 and 1312 St. Aubin, was purchased on January 15, 1946 for $1,000.00.

12. The original complaint in instant action was filed November 22, 1961.

of the full use, benefits and rights of ownership in the property to such an extent as to amount to a "taking" for which just compensation is required under the Fifth Amendment to the Constitution of the United States, by causing and permitting the threat of imminent condemnation to hang over their property for ten years, all the while encouraging the decay and desertion of the area, and then discontinuing the action and instituting new proceedings with appraisals based on the lower values of vacant property in a, by this time, blighted area.

■ The Fifth Amendment to the United States Constitution provides:

"No person * * * shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation."

This requirement of just compensation for the taking of private property for public use has been held for more than half a century to apply to the states, as it is incorporated into the meaning of "due process" required by the Fourteenth Amendment to the United States Constitution.[13] Chicago, B. & Q. R. R. v. City of Chicago, 166 U.S. 226, 236, 17 S.Ct. 581, 41 L.Ed. 979 (1897), cited with approval in Malloy v. Hogan, 378 U.S. 1, 4, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1963). See also Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1961); Backus v. Fort Street Union Depot Co., 169 U.S. 557, 18 S.Ct. 445, 42 L.Ed. 853 (1898); Fallbrook Irriga-

tion District v. Bradley, 164 U.S. 112, 17 S.Ct. 56, 41 L.Ed. 369 (1896).

■ The question is not merely whether the procedure by which plaintiffs' land was condemned complied with the requirements of due process, in that plaintiffs had due notice of the proceedings, had the right to appear in court, had the right to make motions to the court to dismiss or otherwise protect their rights, and had the right to make a defense. The question is whether the city although complying with the statutory procedures, which provide procedural due process, has, nevertheless, taken plaintiffs' property without just compensation.[14] As was stated by Justice Harlan in the Chicago, Burlington & Quincy Railroad opinion (supra at page 234, 17 S.Ct. at page 584):

"But a state may not, by any of its agencies, disregard the prohibitions of the fourteenth amendment. Its judicial authorities may keep within the letter of the statute prescribing forms of procedure in the courts, and give the parties interested the fullest opportunity to be heard, and yet it might be that its final action would be inconsistent with that amendment. In determining what is due process of law, regard must be had to substance, not to form."

■ The first question which must be determined is whether the actions of the city caused or contributed to the decline in value of plaintiffs' property to such an extent as to amount to a "taking" of the property. Defendant contends that the plaintiffs' property, like the entire area,

---

13. The relevant part of the Fourteenth Amendment provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

14. Questions going to "property", "taking", "just compensation" and "payment" are all facets of the central federal question

of denial of due process and there is the possibility of a federal question in every taking by eminent domain under state authority, even if all requirements of state law have been complied with. McCoy v. Union Elevated Ry., 247 U.S. 354, 38 S.Ct. 504, 62 L.Ed. 1156 (1918); Monongahela Nav. Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463 (1893); Chicago B. & Q. R. R. v. City of Chicago, supra; 18 Am.Jur. Eminent Domain § 4 p. 633 (1938); Kauper, Basic Principles of Eminent Domain, 35 Mich.S.B.J. 10, 12 (1958).

was old, run down, dirty, and uninhabitable in 1950 when the condemnation proceedings were started[15]; that over 75% of the properties were owned by absentee landlords and occupied by renters, which fact is always essential in the deterioration of a neighborhood; and that the massive decrease in tenancy in the area was comparable to a current nationwide trend of abandonment of the older, decayed, central core of the large metropolitan cities of the United States. As reason for this abandonment the city points to the exodus of Detroiters to the suburban areas which made newer and better housing available in the city, and the decision of the United States Supreme Court preventing state courts from enforcing private restrictive covenants which bar potential real estate purchasers on account of race, creed or color.[16]

There is no doubt but that these were important factors in the deterioration of this area in general and that they provide a partial explanation of the emigration from the area. However, there is substantial evidence that the city actually encouraged and aggravated this deterioration after the commencement of the proceedings through the actions of various city officials. These actions include, informing plaintiffs that they would receive no compensation for improvements and that they were only to "keep the roof on and the water running", requiring the signing of a "Waiver of Claim for Damages" as a condition precedent to the issuance of a building permit,[17] actually completing the condemnation and clearance of several blocks in the area, requiring the razing of many vandalized buildings, and keeping the lis pendens in effect for five years after the Public Housing Administration had issued a stop order on the project, all the while telling those who inquired that the property would be condemned soon. There is also evidence that the lis pendens had the effect of impairing sales of property, thus reducing sales prices and values. Therefore, this court finds, as a matter of fact, that the protracted delay and the actions of the defendant, if they were not the only causes, substantially contributed to, hastened and aggravated the deterioration and decline in value of the area in general and of plaintiffs' property in particular.

Next, it must be determined whether the actions of the city causing the decline were such as to amount to a "taking" of the property for which just compensation is required. Defendant contends that even if such actions did cause a decline in the value of property, such decline is merely a consequence of condemnation, and that if any such "consequential" damages were sustained, they must be considered as a part of the burden of citizenship shared by each man in common with the other. Mitchell v. United States, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644 (1925); Kimball Laundry Co. v. United States, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). Defendant asserts that the only "taking" of plaintiffs' property occurred in 1963 when the award was determined and the compensation secured, that damage to the property must amount to the taking of an easement before compensation is required, and that plaintiffs' proper remedy for any damages caused by the delay was by independent action against the city for negligence.

■ Generally, the term "taking" is construed in its literal sense, that is, a taking occurs when the verdict is confirmed, the deed executed, and the award paid. There are, however, special situa-

---

15. The appraisals of plaintiffs' property prepared for the city in 1954, described the dwellings as being very old and greatly depreciated, with falling plaster, exposed wiring and unsatisfactory sanitary facilities. See plaintiffs' exhibits 12 and 14.

16. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

17. By filing such a document the property owner formally waived any claim to the increased value of the property as a result of the improvement. See plaintiffs' Exhibit 17.

tions where the actions of a governmental body are such as to amount to a taking of private property, regardless of whether there is an eminent domain proceeding, and in such situations, compensation is given for the taking when it occurs. The United States Supreme Court has held that a taking occurs when the use and enjoyment of land is reduced by the noise and vibration of regular and frequent flights of airplanes at low altitudes over the property, where the government fires projectiles over the land during artillery practice, where the agricultural value of land is destroyed by underflow from a government dam, where gases and smoke are forced from the mouth of a railroad tunnel near property in such a manner as to render it less habitable and to depreciate it in value, and where the government's temporary condemnation of a business property has the inevitable effect of depriving the owner of the going-concern value of his property, even where the government did not avail itself of such going-concern value. Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1963); United States v. Causby, supra; Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922); United States v. Kansas City Life Ins. Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); Richards v. Washington Terminal Co., 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088 (1941); United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945); Kimball Laundry Co. v. United States, 338 U.S. 1, 13, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949).

The Michigan Supreme Court has in several cases awarded compensation where a governmental agency has by deliberate acts reduced the value of private property and thereby deprived the owner of the full use and value of his property. See Long v. City of Highland Park, 329 Mich. 146, 45 N.W.2d 10 (1950); Grand Trunk Western R. R. v. City of Detroit, 326 Mich. 387, 40 N.W.2d 195 (1949), both cases where the city attempted to render properties, through the zoning laws, of little value and to then condemn them; Pearsall v. Board of Supervisors of Eaton County, 74 Mich. 558, 42 N.W. 77, 4 L.R.A. 193 (1889), a road closing case;[19] and Ranson v. City of Sault Ste. Marie, 143 Mich. 661, 107 N.W. 439, 15 L.R.A.,N.S., 49 (1906), a similar case in which the city restricted access to plaintiffs' property.

The contention of defendant that the damage to plaintiffs' property must be such as to amount to the taking of an easement before compensation is required simply cannot be accepted. If it were, condemning authorities could deprive thousands of property owners of the "just compensation" to which they are entitled under the Fourteenth Amendment, by the simple procedure of commencing a condemnation action, prolonging it while they encourage deterioration of the area by filing a lis pendens, tearing down some buildings, ordering welfare tenants to move, etcetera, and then abandoning it and commencing new proceedings at which awards are based solely on value at that time. Although, the United States Supreme Court in the *Griggs* and *Causby* cases held that the interference with property was such as

19. In *Pearsall* the court stated, at page 562, 42 N.W. 77:
 " * * * the term 'taking' should not be used in an unreasonable or narrow sense. It should not be limited to the absolute conversion of property, and applied to land only; but it should include cases where the value is destroyed by the action of the government, or serious injury is inflicted to the property itself, or exclusion of the owner from its enjoyment, or from any of the appurtenances thereto. * * *

"If the public take any action which becomes necessary to subserve public use, and valuable rights of an individual are thereby interfered with, and damaged or destroyed, he is entitled to the compensation which the constitution gives therefor, and such damage or destruction must be regarded as a 'taking.'"
Quoted with approval, in City of Detroit v. Cassese, 376 Mich. 311, 313, n. 1, 136 N.W.2d 896 (1965).

to amount to the taking of an air easement over the property, the Supreme Court has in no wise intimated that there must be an easement before a "taking" in the constitutional sense occurs.

Indeed, that court said, in United States v. General Motors Corp., supra, 323 U.S. at page 378, 65 S.Ct. at page 359:

"In its primary meaning, the term 'taken' would seem to signify something more than destruction, for it might well be claimed that one does not take what he destroys. But the construction of the phrase has not been so narrow. The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking."

The question of whether actions such as occurred here amount to a "taking" in the constitutional sense has not yet been faced by the Supreme Court. However, the courts of several states, including Michigan, have recently considered the question. The Michigan Supreme Court, in City of Detroit v. Cassese, 376 Mich. 311, 136 N.W.2d 896 (1965), a case arising out of the same factual situation, held that acts by the city, such as filing lis pendens, sending letters to tenants advising of the impending condemnation, making intense building department inspection and citations against owners for any violations of the building code, razing of vacant and vandalized buildings, refusing to issue permits for substantial improvements, etcetera, would constitute a taking of a property.

This conclusion is supported by the decision in City of Cleveland v. Carcione, 118 Ohio App. 525, 190 N.E.2d 52, 5 A.L. R.3d 891 (1963), which held that the depreciation in value of a parcel of property at the time of appropriation, where the property is included in a general plan of condemnation, should not be borne by the owner. In the *Carcione* case, plaintiffs' property was part of a large area designated as an urban renewal site in 1957, at which time city and county welfare departments instructed plaintiffs' tenants to move. The city then began to raze the buildings piecemeal as it acquired title and by the time plaintiffs' property was condemned only 35–40 structures remained in a vast area where nearly 600 buildings had stood. The Ohio court held that the value of plaintiffs' property should be based on its fair market value immediately before the city took active steps to carry out the work of the project which to any extent depreciated the value of the property.[20]

The logic and fairness of such an approach is apparent when it is realized that where condemnation proceedings tend to increase the value of property, the property owner is not entitled to the increased value. United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913); Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893); Anderson v. United States, 179 F.2d 281. (5 Cir., 1950), Murray v. United States, D.C.App.1942, 76 U.S.App.D.C. 179, 130 F.2d 442.

As is said in 3 Lewis, Eminent Domain, § 1329 (3rd Ed. 1909):

"If the proposed improvement had depreciated the value of the property, it

**20.** Several other state courts have recently considered the problems of depreciation in the value of condemned property resulting from the prospect or commencement of the eminent domain proceedings, and have held that such depreciation should not enure to the benefit of the condemnor. Lower Nueces River Water Supply Dist. v. Collins, 357 S.W.2d 449 (Tex.Civ.App.1962); State, through Department of Highways v. Clark, 135 So.2d 329 (La.App.1961); Buena Park School District v. Metrim Corp., 176 Cal. App.2d 255, 259, 1 Cal.Rptr. 250 (1959), quoted with approval in People ex rel. Dept. of Public Works v. Lillard, 219 Cal.App.2d 368, 33 Cal.Rptr. 189 (1963); Congressional School of Aeronautics, Inc. v. State Roads Commn., 218 Md. 236, 146 A.2d 558 (1958).

would be very unjust that the condemning party should get it at its depreciated value; and that the correct rule would seem to be that the value should be estimated irrespective of any effect produced by the proposed work * * * ."[21]

■ Defendant's contention that plaintiffs were not deprived of just compensation because they had an opportunity to file an action for negligence against the city, and that damages for delay are not compensable in the condemnation action, is unacceptable. A second condemnation action was commenced shortly after the first was discontinued. Plaintiffs had every right to believe that they would be fairly compensated in that action, as indeed they should have been. The Michigan Supreme Court in *Cassese* held that the actions of the city in the first action, which might amount to a "taking", were compensable in the second action. Similarly, in *Carcione* the Ohio court held that the affirmative actions of the City of Cleveland which lowered the value of plaintiffs' property were compensable in the condemnation action. There is no logic or fairness in a procedure which prevents a party from receiving full compensation in the condemnation proceedings for all of his property which has been taken and forces him to bring an independent action for damages in which he must show fraud or negligence.

A statement which is apropos here was made by the Pennsylvania Supreme Court in Hermann v. North Pennsylvania R. R., 270 Pa. 551, 113 A. 828 (1921), involving a state statute providing that it was unlawful to erect a building on a plotted, but unopened street, and that when the street was opened the buildings were to be removed at the owner's expense. This statute had an adverse effect on the value of property located on such plotted streets, and the court, in passing upon the damages available upon condemnation when the street was opened, said:

"We have repeatedly decided that no damages are collectable until a legal opening occurs, by the actual taking of land * * * but in Re South Twelfth Street, 217 Pa. 362, 366, 66 A. 568, 569, while acknowledging this rule, we recognized also that any 'impairment of value' resulting from the plotting of a street in anticipation of its opening must be viewed 'as the immediate consequence of steps * * * toward the [eventual] appropriation * * * of the owner's land.' When the appropriation takes place, this 'impairment of value' from these preliminary steps becomes merged, as it were, in the damages then payable; the matter being worked out practically in assigning the damages, by simply ignoring the detrimental effect of the plotting, and treating the value of the property as though there had been no such harmful results.

"If the course just outlined were not followed at the time of the appropriation the law, in justice to the owner, would have to pursue the somewhat impractical method of considering two separate items: (1) The early impairment of value, suffered by the owner from the plotting; and (2) the damages to the real estate, as thus impaired, caused by the subsequent taking of the land.

"Otherwise, as said in Re South Twelfth Street, supra, we would have illegal 'confiscation * * * fully disguised.' This complication is avoided, however, in the practical manner indicated." Pages 828–829, 113 A. page 829.

Thus, this court now holds that the actions of the defendant which substantially contributed to and accelerated the decline in value of plaintiffs' property constituted a "taking" of plaintiffs' property within the meaning of the Fifth

21. See also, 1 Orgel, Valuation Under Eminent Domain §§ 105–106 (2d Ed. 1953).

Amendment, for which just compensation must be paid.

It is not disputed that the value placed upon plaintiffs' property at its eventual condemnation in 1963 was its value at that time and that the award received by plaintiffs did not include any compensation for the decline in value of plaintiffs' property during the pendency of the first condemnation proceedings.[22] Thus, plaintiffs did not receive just compensation for the taking of their property.

Normally, it is the function of the condemnation jury to decide when the taking occurred and the value of the property at that time. However, in order that plaintiffs be granted the damages to which they are entitled for the deprivation of their property without due process, it is necessary to determine what would have constituted just compensation.

 Although there is some difference of opinion among the authorities as to the method of establishing just compensation,[23] the most widely used formula is the difference between the value of the property before and after the taking.[24] In the *Cassese* case, the Michigan Supreme Court set out the following formula:

"First, the date of taking should be determined. Next, the value of the property as of that date is to be ascertained. There should be deducted from the award any amounts that accrued to the owner from his possession of the property or that reflect the value of its use following the taking. In the instant case this would consist of the rentals which Cassese received for parcel 663 and the land contract

payments which he received for Parcel 495, less any expenses in connection with maintenance, upkeep or repossession, of the properties, such as water and light bills, insurance, taxes, etc. Finally, interest should be added from the date of taking to the date of award."

The formula set forth in *Cassese* may appropriately be applied here. However, because of the different procedural context in that case and the one at bar, the amount of the award received by plaintiffs must be deducted from the value of the property as of the time of taking.[25]

 In Carcione v. City of Cleveland, supra, the correct date of valuation of the property was held to be the date immediately before the city took any steps to carry out the work of the project which to any extent depreciated the value of the property. However, from the proofs presented at the trial of the present case, it does not appear that the actions of the city had a substantial effect on the property of these plaintiffs until 1954. It was in 1954 that plaintiffs found themselves able to rent only one of the four apartments, and that at a much lower rental. At that time people began moving out of the area in large numbers, vandalism increased greatly, building inspections were increased and enforcement of building codes tightened, insurance became unavailable, and the property became virtually useless to plaintiffs. This court concludes that the taking of plaintiffs' property occurred during the latter part of 1954 and that plaintiffs were entitled to just compensation for their property as of that time.

22. See paragraph 12 of defendant's answer to plaintiffs' second amended complaint.

23. See, e. g., 3 Nichols, Eminent Domain, § 8.643 n. 3 (3rd Ed. 1965).

24. Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); see Dettleback, Just Compensation for Real Estate Condemnation. 15 Cleve.-Mar. L.Rev., 171, 174 (Jan. 1966).

25. The *Cassese* case involved a direct appeal to the Michigan Supreme Court from the award granted the property owner in the second condemnation proceeding. The Supreme Court remanded the action to the Recorder's Court for a new trial with the award to be computed following the formula set forth in the opinion. In the instant case the award received by plaintiffs in the Recorder's Court action, not having been appealed, has become final.

Very little proof as to the actual value of plaintiffs' property in 1954 was adduced at the trial, and this court cannot speculate as to what such value may have been. However, appraisals made for the city, dated December 15, 1954, provide evidence of at least the minimum value of the property at that time. The lack of proof of greater value should not prevent the plaintiffs from receiving at least this minimum value. As in the formula set forth in *Cassese*, there must be deducted from this amount any amounts which accrued to plaintiffs from their possession of the property after December 1, 1954 (e. g. rentals), less any expenses in connection with the maintenance and upkeep of the properties. Plaintiffs are also entitled to the cost of demolition, as that is an expense which normally is, and should be, borne by the condemning authority. However, they are not entitled to any lost rents after December 31, 1954, and indeed must credit defendant with any rent received after that date. Nor are they entitled to the amount spent on improvements or repairs in 1949, as there is no proof that this expenditure affected the value in 1954. The plaintiffs are entitled to the difference between the amount computed by this formula and the award received in 1963, plus interest.

The final issue facing the court is whether plaintiffs have established a class action under Rule 23(a) (3) of the Federal Rules of Civil Procedure and, if so, whether the unnamed plaintiffs may intervene after the determination of defendants' liability to share in the fruits of the judgment obtained by the named plaintiffs. Rule 23(a) provides:

"If persons constituting a class so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is * * * (3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

Defendant contends that the class of persons on whose behalf the action is brought has not been adequately identified, that there is no showing that these persons are so numerous that they cannot be brought before the court, that named plaintiffs do not adequately represent the class, that there is no showing that each member of the class has a claim for the minimum jurisdictional amount, and that there are not sufficient questions of law or fact in common to warrant a class action.

To the contrary, the class has been identified as consisting of those property owners within the "Mich. 1–11" area who have been subject to the dual condemnation actions here involved. Clearly, the number of persons in an area encompassing nearly 25 city blocks is too large for it to be practicable to bring them all before the court.[26] Plaintiffs, as members of the class, with no interests in conflict with the class, are such persons as will "fairly insure the adequate representation" of the class.[27] As for the alleged failure to show the jurisdictional amount, the cases are in conflict as to whether each intervening plaintiff must, as to his own claim, meet all of the jurisdictional requirements as to the amount in controversy.[28] However,

---

26. There is in the record of this case a list of well over 50 such persons who are potential intervenors.

27. Furthermore, it appears that plaintiffs were chosen at a group meeting to represent the class in the matter.

28. Compare, Newsom v. E. I. Dupont De-Nemours, 173 F.2d 856 (6th Cir.), cert. denied, 338 U.S. 824, 70 S.Ct. 70, 94 L.

Ed. 500 (1949); Knowles v. War Damage Corp., 83 U.S.App.D.C. 388, 171 F.2d 15, cert. denied, 336 U.S. 914, 69 S.Ct. 604, 93 L.Ed. 1077 (1948); Ames v. Chestnut Knolls, Inc., 159 F.Supp. 791 (D.Del.1958), with Hunter v. Southern Indemnity Underwriters, 47 F.Supp. 242 (D.Ky.1942); Hess v. Anderson Clayton & Co., 20 F.R.D. 466, 477–478 (D.Cal. 1957) (dictum).

it is not necessary to pass on this question at this time, as no one has as yet attempted to intervene with less than the required amount in controversy.

Defendant strongly asserts that while there may be some common questions of fact or law, they are not sufficient to warrant a class action, especially in view of the number and variety of proofs relating to each separate parcel of property. Defendant relies heavily upon the case of Keavy v. Anthony, 2 F.R.D. 19 (D.R.I.1941), in which the court refused to allow numerous property owners to maintain a class action against municipal officials for destruction of houses damaged in a hurricane, on the ground that there were so many different questions of law and fact affecting the several rights that the jury might be confused. The court indicated that it was unwilling to open up a new field of litigation in the federal courts on such facts. However, in the present case there are important common questions of law and fact affecting all members of the class which override the factual differences regarding the damages suffered by each in-

dividual. Thus, it appears that a class action under Rule 23(a) (3) is proper in this situation.[29]

■ Finally, the courts have been divided upon the question of intervention by members of the class after the rendition of a favorable verdict. One line of authority is to the effect that rule 23(a) (3) is merely a permissive joinder device, and that consequently only those persons who are actually parties to the litigation may share in the judgment.[30] Other courts, in cases where there has been an identifiable class, have allowed unnamed plaintiffs to share in the judgment obtained by their representatives, insofar as each is able to prove both membership in the class and damages.[31] As stated by Justice Murrah in the *Union Carbide* decision, "the latter solution undoubtedly results in the more expeditious and efficient disposition of litigation and ought therefor to be favored."[32] The view favored by Justice Murrah has been followed in the more recent cases, and appears to be more in accord with the concept and

29. The amendment to Rule 23 promulgated by the United States Supreme Court on Feb. 1, 1966, which will take effect July 1, 1966, appears to lend support to this interpretation of the present rule. The amended rule provides, inter alia:

RULE 23. CLASS ACTIONS

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: * * *

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the con-

troversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

30. E. g. Oppenheimer v. F. J. Young & Co., 144 F.2d 387 (2nd Cir. 1944); Weeks v. Bareco Oil Co., 125 F.2d 84, 91 (7th Cir. 1941); 3 Moore's Federal Practice ¶23.11(3) (Rev'd Ed. 1964).

31. E. g., Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10th Cir. 1962); York v. Guaranty Trust Co., 143 F.2d 503, 529 (2d Cir.), rev'd on other grounds, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); State Wholesale Grocers v. Great Atlantic & Pacific Tea Co., 24 F.R.D. 510 (N.D.Ill.1959).

32. Union Carbide & Carbon Corp. v. Nisley, supra, note 31, at page 589.

purpose of class actions. It is, therefore, adopted by this court.

█ The unnamed plaintiffs will have a period of six months, in which to appear and file claims before a special master who will determine their membership in the class and the extent, if any, of their damages, in accordance with the formula adopted in this opinion. The City of Detroit will be required to make available the 1954 appraisals on the property. However, if any claimant can prove that the value of his property was greater he may do so. Likewise the defendant is not precluded from proving that a claimant is not entitled to damages, by reason of his possession and use of the property after the taking, or for any other reason. If, in the process of identifying the members of the class and assessing the amounts of their respective damages, unresolved questions of fact or law are disclosed, they may be submitted to the court for determination. See, Union Carbide & Carbon Corp. v. Nisley, supra; Rule 53, Federal Rules of Civil Procedure.[33]

33. Section (a) of Rule 53 provides that "the court in which any action is pending may appoint a special master therein." However, Section (b) of Rule 53 provides that, in nonjury cases, "a reference shall be made only upon a showing that some exceptional condition requires it." This court is of the opinion that because of the extremely large number of potential intervenors, and because as to most of these intervenors there will be no new question of law or fact, but merely matters of proof and computation of claimed damages, that an "exceptional condition" is present warranting the appointment of a special master.