**SAGINAW TRANSFER CO.**, Saginaw, Michigan, Great Lakes Express, Saginaw, Michigan, Kramer-Consolidated Freight Lines, Inc., Detroit, Michigan, Interstate Motor Freight System, Grand Rapids, Michigan, Bender & Loudon Motor Freight, Inc., West Richfield, Ohio, Norwalk Freight Lines, Inc., Norwalk, Ohio, Eastern Central Motor Carriers Association, Inc., Akron, Ohio, Central States Motor Freight Bureau, Inc., Chicago, Illinois, Central and Southern Motor Freight Tariff Association, Inc., Louisville, Kentucky, and Middlewest Motor Freight Bureau, Kansas City, Missouri, Plaintiffs,

v.

The **UNITED STATES** of America and Interstate Commerce Commission, Defendants,

and

Railway Express Agency, Inc., and Dow Chemical Company, Intervenors.

Civ. A. No. 2748.

United States District Court
E. D. Michigan, N. D.

Nov. 8, 1967.

Rex Eames, Eames, Petrillo, Wilcox & Nelson, Detroit, Mich., Homer S. Carpenter, Richard R. Sigmon, Rice, Carpenter & Carraway, Washington, D. C., for plaintiffs.

John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Donald F. Turner, Asst. Atty. Gen., Lawrence Gubow, U. S. Atty., Detroit, Mich., for the United States.

Leonard S. Goodman, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., Robert W. Gin-

nane, Gen. Counsel, for Interstate Commerce Commission.

William Q. Keenan, New York City, Ralph J. Isackson, Isackson & Neering, Bay City, Mich., for intervenors Railway Express Agency and Dow Chemical Co.

## OPINION

Before O'SULLIVAN, Circuit Judge, ROTH, District Judge, and THORNTON, Senior District Judge.

ROTH, District Judge:

This is an action to set aside and annul an order of the Interstate Commerce Commission approving certain rates in connection with a so-called "delayed-tender" service by the Railway Express Agency. The action was brought pursuant to Title 28, Sections 1336, 1398, 2321 through 2325, U.S.C. and Title 5, Section 1009, U.S.C. The United States of America was made a party as required by Title 28, Section 2322, U.S.C. A Three-Judge Court was convened pursuant to Title 28, Section 2284, U.S.C.; and the Railway Express Agency and a shipper, Dow Chemical Company, have intervened. The case was submitted on the pleadings and a certified copy of the record of proceedings before the Commission. Briefs were filed, and the Court has had the benefit of oral arguments of counsel.

The Commission found the examiner's report correct in all material respects; that the rates under investigation were just and reasonable and otherwise lawful; that the evidence considered in the light of the exceptions and the replies thereto did not warrant a result different from that reached by the examiner. And finding the statement of facts, the conclusions, and the findings of the examiner proper and correct, the Commission affirmed and adopted them as its own.

By schedules filed December 11, 1961, the Railway Express Agency proposed commodity rates on specified commodities listed under a heading of "chemicals," in shipments the aggregate weights of which total 20,000 and 30,000 pounds or more, from Midland, Michigan, to points in Delaware, Maryland, New Jersey, New York, Pennsylvania, Virginia, New England, and the District of Columbia. The schedules were not suspended and became effective January 15, 1962, but were made the subject of investigation by order of January 10, 1962. The rates were protested by the Eastern Central Motor Carriers' Association, Inc., Norwalk Truck Lines, Inc., Great Lakes Express Company, and Interstate System, Inc.; the last three being motor common carriers of general commodities. The tariff rules require prepayment and aggregation, with tender from one shipper at one address at one time, and allow consignment to any number of consignees at any points in the destination area, individual shipment being subject to charges, including minimum charges, varying with the destinations. The subject rates are available to all shippers situated at Midland, but as a practical matter lend themselves only to the traffic of the Dow Chemical Company which, the examiner found, cooperated in working out the rates and the attendant handling.[1]

Railway Express Agency made the rate of $2.89 per hundredweight applicable to all sizes of shipments when tendered in aggregates of 20,000 pounds and $2.63 cwt., when tendered in aggregates of 30,000 pounds. Motor carrier rates from Midland to New York City were: 1000 pounds $3.61 cwt.;

between 1000 to 1999 pounds, $3.33 cwt.;

between 2000 to 4999 pounds, $3.13 cwt.; and

for 5000 pounds or more, $2.89 cwt.

---

1. There is an embraced proceeding involving commodity rates for aggregate shipments of chemicals from Midland, Michigan, to points in the South and West. The parties to such proceeding have stipulated to be bound by the results reached in this case.

Railway Express Agency's mode of operation under the rates is outlined in the hearing examiner's report (326 I.C.C. 660) as follows:

"Under the rates, respondent spots a trailer for loading at Dow's less-than-truckload dock at 4:00 p. m. of a tender day (a straight truck serving the plant every day is used for any overflow), and Dow and REA personnel complete loading by 8:30 p. m.; an REA tractor pulls the load to the Saginaw, Mich., REA office (approximately 31 miles), whence the New York Central Transport Company, a motor carrier subsidiary of the New York Central Railroad Company, moves it over the road 95 miles to Detroit, arriving about 12:30 a. m. the next day.

"At Detroit the (rear-loaded) traffic, except explosives, destined to New England and up-State New York is loaded into rail cars for eastern movement on the Central at 3:15 a. m., in "regular" REA service. The explosives, including those destined to New York City, are moved by truck to Toledo, thence by train to destination. The Midland trailer, with its remaining traffic and any additional Pittsburgh traffic waiting at Detroit is dispatched to Pittsburgh, 286 miles. From Pittsburgh the Midland traffic moves to destination in REA's "regular" service, rail or motor."

■ In discharging our duty to review the Commission action, we recognize that if the conclusions of the Commission are in accordance with law, not arbitrary, or an abuse of discretion, and supported with adequate findings revealing a rational basis, and is not against public policy, its decision may not be disturbed by us on review. Eastern Express, Inc. v. United States, D.C., 198 F.Supp. 256 (1961).

■■ Ordinarily, we bow to Commission expertise; but expertise is not sufficient in itself to sustain a decision. The order must be supported by substantial evidence and must be within the statutory limits placed on the Commis-

sion's powers by Congress. It is our duty to test the order by measuring it against the requirements of the Administrative Procedure Act, Section 10, the statutory limits and authority expressed by Congress, and the National Transportation Policy, 49 U.S.C., preceding Section 1. Eastern Central Motor Carriers Association, Inc., v. United States, D.C., 239 F. Supp. 591 (1965). As pointed out in Florida East Coast Railway Co. v. United States, D.C., 259 F.Supp. 993, page 999 (1966):

"This Court must not shirk its duty by providing only a perfunctory review. But we are equally bound to keep our review within the limits intended by the statutory scheme of this particular agency. We would be no friend of the administrative process if we were to leave the Commission at large, free to roam from one arbitrary or capricious act to another. If judicial review is to have a basis for functioning, the ICC must do more than announce its ultimate conclusions by way of unrationalized fiat. The Commission must explain its reasoning in clear and precise terms. It must support its application of that reasoning to the instant case by substantial evidence in the record on which we must base our review. It is for us to determine whether the ICC has correctly applied the proper standards, and thus exhibited that familiarity with the problems in the transportation industry which Congress anticipated the ICC would achieve from its particularized experience."

With these accepted guidelines in mind, we have scrutinized the adopted statement of facts, the conclusions and findings of the examiner. We agree with the examiner that "it is elementary that under the Interstate Commerce Act, Part II, there can be no lawful rate in the absence of authority to perform the service for which the rate is published." We encounter difficulty immediately, however, when we join the examiner in his noble excursion in an endeavor to first define the term "express service" and then to ap-

ply such definition to the question: Is the service to which the rates apply an "express service?" The report concludes a long dissertation on the difficulties of defining "express service" by holding that: (326 I.C.C. 665)

"Thus, respondent is something more than a part-I 'express company' for it holds over-the-road operating authority under part II; however, it is not the same in all respects as any other part-II express carrier, such as Mistletoe, or even Arrowhead, for it retains, under part II, some semblance of its part-I status, and its operating rights reflect that fact. In its part-II operations, therefore, it actually assumes a third status; as with the subject of a once popular song, being a combination thereof, it is neither swan nor goose, but truly, 'swoose.' The examiner concludes that respondent's hybridity is more help than hindrance to its apparent purpose of being all things to all shippers, and that even if the traffic on which the considered rates apply did not consist primarily of relatively small shipments requiring expedited handling and saturation coverage (and they are not so confined), the considered rates and service would not be beyond the pale of respondent's peculiar and unique status and authority. * * In the circumstances, the applicability or not of section 15a(3) and its interpretation in Interstate Commerce Commission v. New York, N. H. & H. R. Co., 372 U.S. 744, 83 S.Ct. 1038, 10 L.E. 2d 108, appears to be academic."

We are unable to understand the reasoning and rationale behind the Commission action in this case. In spite of our most diligent efforts to discover the reasoning behind the examiner's report, we confess our failure. It is difficult to say whether the examiner had a meaning and could not express it, or was indifferent as to whether his words mean anything or not. If he found that the service here proposed is "express service" within the meaning of the controlling statutes, he has neglected to say so. His words, to paraphrase Orwell, fall upon the facts of the case like soft snow, blurring the outlines of his reasoning and covering all the details. There is no disclosure in the report that the examiner put the proposed rates to a test of the controlling statutory provisions or the National Transportation Policy, although he does say that "the applicability or not of section 15a(3) * * * appears to be academic." His treatment of the question of respondent's terminal operations is equally cavalier. The characterizations "hybridity," "swoose," "unique status," and "all things to all shippers" do not mesh with congressional expressions on the subject of transportation.

■ This Court should not be expected to speculate as to the basis for the conclusion of an administrative agency. Pre-Fab Transit Company v. United States, D.C., 262 F.Supp. 1009 (1967). As Mr. Justice Brandeis said in United States v. Baltimore & Ohio R.R. Co., 293 U.S. 454, page 464, 55 S.Ct. 268, 79 L.Ed. 587, basic findings cannot be "left entirely to inference." And the words of Mr. Justice Cardozo in United States v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 are strikingly apropos here:

"* * * The difficulty (here) is that it has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi-jurisdictional findings of an administrative agency. * * * We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

The provision for judicial review of the Commission's actions by Congress contemplates more than a rubber stamp approach. In a recent decision by the United States Supreme Court, Baltimore & Ohio R.R. Co., v. United States, 386 U. S. 372 at 443, 87 S.Ct. 1100, 1138, 18 L. Ed.2d 159, 202 (1967), Mr. Justice Doug-

las emphasized the necessity of findings to responsible judicial review:

" 'Congress has also provided for judicial review as an additional assurance that its policies be executed. That review certainly entails an inquiry as to whether the Commission has employed those statutory standards. If that inquiry is halted at the threshold by reason of the fact that it is impossible to say whether or not those standards have been applied, then that review has indeed become a perfunctory process. If, as seems likely here, an erroneous statutory construction lies hidden in vague findings, then statutory rights will be whittled away. An insistence upon the findings which Congress has made basic and essential to the Commission's action is no intrusion into the administrative domain. It is no more and no less than an insistence upon the observance of those standards which Congress has made 'prerequisite to the operation of its statutory command.' * * * Hence that requirement is not a mere formal one. Only when the statutory standards have been applied can the question be reached as to whether the findings are supported by evidence.' * * *

"Many crucial issues, necessary for evaluation by the Commission, are not even exposed in this record, let alone appraised. The absence of these findings makes judicial review impossible."

We add here, as did Mr. Justice Douglas in the cited case, that many crucial issues, especially the impact of the proposed style of service upon the National Transportation Policy, necessary for evaluation by the Commission, are not exposed in the record before us, let alone appraised.[2]

The statement of facts, conclusions, and findings of the examiner, affirmed and adopted by the Commission, do not provide this Court with a basis for determining whether the result reached comports with the statutory standards and the Na-

tional Transportation Policy. While conceding that respondent's authority is limited to "commodities moving in express service," we can find no resolution of the issue thus presented. While recognizing the legal intricacies of the matter, we do not believe that they excuse the obscurity and involution of the ruling by the agency. If we were to speculate, we might consider the findings and conclusions to mean that the distinction between "express" and "regular" or "ordinary" service has ceased to exist, or, if not, that there are no meaningful criteria left by which to test either. So far as we can tell, Congress has not become aware of this hypothetical development, and has made no provision for dealing with it.

We have been urged to accept New England Motor Rate Bureau, Inc. v. United States, D.C., 254 F.Supp. 663 (1966), affirmed by the United States Supreme Court, without opinion, 385 U.S. 203, 87 S.Ct. 407, 17 L.Ed.2d 300, December 5, 1966, as having settled the issue before us. That decision cannot supply the deficiencies we find in our case, and even *New England* concedes that a "service might be so far diminished as to cease to be an express service entirely." To this point the examiner and the Commission did not address themselves in the case before us, or if they did, they failed to resolve it except for the fiat of approval of the proposed rates. There is an inference in the action of the Commission that the Railway Express Agency should be allowed to furnish this style of service because it is desired by the intervening shipper, Dow. But, if that desire, in combination with the policy of the Act, disables the Railway Express Agency from obtaining the business, that is simply the result of the National Transportation Policy. As pointed out in American Trucking Assoc., Inc. v. United States, 364 U.S. 1, 80 S.Ct. 1570, 1588, 4 L.Ed. 2d 1527, 1537:

"This consequence, we believe, does not meet the compelling public interest

---

**2.** By order dated June 2, 1965, the Commission denied a petition by plaintiffs seeking a finding that the proceedings below involved an issue of general transportation importance under 49 C.F.R. Section 1.101.

standard established by American Transportation Associations. A contrary conclusion would open the door to approval of over-the-road contract trucking by railroad subsidiaries to most, if not virtually all, major destinations, and hence would greatly attenuate the safeguards which have been painstakingly erected to prevent railroad domination of trucking. Appellees say that these safeguards are no longer needed, because independent trucking is no longer an 'infant industry.' This is an immaterial argument in this forum. We do not condemn the wisdom of the Commission's action. We simply say that the transportation legislation does, and that the pardoning power in this case belongs to Congress."

On occasion the Commission has stated that it was "not convinced that the way to maintain for the future healthful competition between rail and truck service is to give railroads free opportunity to go into the kind of service which is strictly competitive with, rather than auxiliary to, their rail operations." Pennsylvania Truck Lines, Inc.—Control—Barker, 1 M.C.C. 101, 111. The style of transportation here involved at least raises the question of whether it amounts to an incursion by the railroads into common motor carrier operations. It is plain to us, and we cannot conceive that it was not to the Commission, especially in view of the embraced proceedings, that this amounts to an expansion of the REA's authority, and one likely to set a pattern for further and perhaps nation-wide application. The statutory standards require at least some degree of consideration of the consequences suggested by the circumstances surrounding the rates and service here involved. The "public interest" requires consideration of all important consequences. The increasing diversification of REA's transport activity should have, "if not aroused the Commission's concern, at least received consideration." See Denver & R. G. W. R. Co. v. United States, 387 U.S. 485, 87 S.Ct. 1754, 18 L. Ed.2d 905. It takes no expertise to rec-

ognize that REA's venture in *New England,* supra, and in this case could have a significant impact upon the general motor vehicle transportation field. From a competitive standpoint, REA's aggressive action is commendable, viewed from its own best interest, but this in no way justifies the failure of the Commission to place this new style of transportation service into the broad prospective of the National Transportation Policy, and to consider and measure it against the objectives there spelled out.

 The thin veil between REA and the railroads allows us to see the proposed action here as that of the latter. There is no indication in the findings and conclusions before us that the Commission pierced the veil. It occurs to us that the rates approved at least raise the question: Are the railroads here entering the common motor carrier field and rendering a pure motor carrier service? The Commission has not given us an answer. Under the circumstances, we consider this a serious error. The Commission should recognize, as has the Supreme Court in American Trucking Assoc., Inc. v. United States, 364 U.S. 1, 80 S.Ct. 1570, 4 L.Ed. 2d 1527, that Congress has expressed a strong general policy against railroad invasion of the motor carrier field. While railroads should be able to use service by motor vehicle to public advantage in *their operations,* if the motor transportation is essentially unrelated to rail service, the railroad parents are invading the field of trucking; and under normal circumstances, the National Transportation Policy is thereby offended.

The report of the examiner, affirmed and adopted by the Commission, fails to "articulate any rational connection between the facts found and the choice made." Ringsby Truck Lines, Inc. v. United States, D.C., 263 F.Supp. 552 (1967). The Commission has seen fit to leave us in the dark. We should not be required to go through the record, catching at straws, which lead us every which way, and in the end force us to guess about a matter which could easily have

been set right in the beginning. We do not propose to indulge in a thimblerig game challenging us to find the legal pea.

We return the case; and in so doing, we emphasize that we do not question the Commission's authority, so long as its exercise is consistent with the statutory standards which govern its action and are formulated, not only after due consideration of the factors involved, but with sufficient explication to enable the parties and ourselves to understand, with a fair degree of assurance, why the Commission acts as it does. We do not undertake to tell the Commission what it should do; we only require that, whatever result be reached, enough be put on record to enable us to perform the limited task which is ours. Eastern-Central Motor Carriers Assoc. v. United States, 321 U.S. 194, 211, 212, 64 S.Ct. 499, 88 L.Ed. 668.

For the reasons stated, the Commission's order must be annulled; and the matter remanded to the Interstate Commerce Commission for such further proceedings as the Commission may see fit to take, consistent with this Opinion.