[No. 39937.    Department One.    May 2, 1968.]

E. M. GREENWOOD, *Appellant*, v. THE CITY OF SEATTLE, *Respondent.**

*Lenihan & Ivers, Henry T. Ivers* and *James F. McAteer,* for appellant.

*A. L. Newbould* and *John P. Harris,* for respondent.

LANGENBACH, J.†—Plaintiff-appellant owned the lots on the southeast corner of 4th and James Streets in Seattle. He had planned to demolish the 2-story building thereon and replace it with a 12-story structure. He had procured architectural and engineering services and plans, and had executed a contract for the construction of such a building. He had also arranged to secure financing from an insurance

*Reported in 440 P.2d 437.

†Judge Langenbach is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

company. He had been issued proper permits by the city to demolish the present building and to erect a new one.

Demolition started March 18, 1964, and early in April he was notified by the mayor that the city proposed to acquire this property (with others) for governmental purposes. Demolition was then discontinued and negotiations proceeded with the city officials. Up to this time, expenses in the amount of $241,578.97 had been incurred.

The record disclosed that, on May 8, 1964, the mayor wrote appellant:

> May we suggest that you give the City a firm offer of the amount you would accept for your property at your earliest convenience?

There is no answer to this inquiry in the record. Had an answer been given to this query, possibly this litigation might have been avoided, or at least the positions of appellant and the city would have been clarified.

August 3, 1964, the mayor notified appellant that the city and King County would acquire this property. October 13, 1964, appellant was advised that King County alone would procure said property, and the county commissioners authorized the prosecuting attorney to enter condemnation proceedings. Subsequently, appellant negotiated the sale of this property to King County for $325,000. (Nothing appears to have been said to the county pertaining to any indebtedness having been incurred with relation to said property.)

August 12, 1965, the city stated that it would not buy the property nor compensate appellant for any losses or expenses theretofore incurred. November 9, 1965, appellant filed a notice of claim for such damages in the sum of $241,578.97. Action was then commenced, and the city answered and moved for a summary judgment. Before any judgment was entered, the appellant sought, and was granted, the right to file an amended complaint.

In the amended complaint, appellant stated the same cause of action for the damages as set forth in the notice of claim. In addition, a second, or alternative, claim was made.

It set forth that the refusal of the city to compensate for such loss and expenses suffered and the city's interference with appellant's possession, use, enjoyment and improvement of his property was a violation of Const. art. 1, § 16 (amendment 9), as a result of which appellant was damaged in the sum of $241,578.97.

The city filed an answer with two affirmative defenses. It admitted that such negotiations had occurred and that subsequent to October 13, 1964, King County had agreed to buy this property. It also pleaded that any claim for damages had not been timely filed within 90 days after suffering damages, as by law and ordinance required.

As a second affirmative defense, the city pleaded that, after appellant was notified King County would purchase the property in October, 1964, appellant negotiated a sale to the county for $325,000 without any exceptions or provisions. Again the city moved for a summary judgment of dismissal, and the court dismissed the action with prejudice.

The only claim of error was the granting of the motion for summary judgment, and in dismissing appellant's claim (for inverse condemnation) under Const. art. 1, § 16 (amendment 9).

The appellant's brief stated:

"The trial court, in granting respondent's motion, entirely missed the basic question in this action. It considered only the physical real property itself, when, in fact, this action does not involve the real property. This action does involve the cost of partial demolition of the old building and the resulting decrease in the market value of the real property. This action does involve the contracts and money expended by appellant thereunder for architectural, engineering and other services, and the taxes paid and rentals lost, all of which has been taken from appellant for public use in accordance with the plan of respondent, and solely as a direct result of respondent's activities."

He argued that the city officials knew for years that plans of public improvements involving appellant's land were under serious consideration. The official who granted

the permits to demolish the old and to construct the new building knew of these projected plans. Yet, no notice was given appellant at any time, so as to stave off these expenditures which this official knew, or should have known, would have been rendered useless when the city acquired the property. It was not until after demolition had commenced, and many of these expenses incurred, that the mayor notified appellant of the city's proposed acquisition.

Even after appellant had been notified that the county, rather than the city, would acquire the property, no definite determination of appellant's rights, as concerned the city, was accomplished. It was not until August, 1965, that the city notified appellant it was no longer interested in the property, and would not be liable for any prior costs or expenses in connection with this property.

It was more than 90 days thereafter before the notice of claim for damages had been filed and given the city. The record does not disclose that the matter of the adjustment of these expenses was thereafter discussed with either the city or county officials.

■ Appellant argued that when the city notified him of its prospective acquisition of his property, he was obligated to cease in order to mitigate any damages thereafter. Yet, when the mayor, in May, 1964, wrote for a firm price for the property, none was forthcoming. That was the prime opportunity to adjust this question of accrued damages—as well as the market value of the property, "as is." The record is silent as to why this was not done. The matter of loss of rentals, the payment of accruing taxes, and further deterioration of the building might have been avoided.

There is nothing to show the extent or nature of the negotiations with the county concerning the status of this property. Apparently in his own judgment and discretion, the appellant decided to accept the cash offer from the county in lieu of the uncertainty and indefiniteness of a recovery in a condemnation proceeding.

Appellant cites *Wilshire v. Seattle,* 154 Wash. 1, 6, 280 Pac. 65 (1929) for the following proposition:

It cannot be the law that a property owner who has been, by a municipality, in the exercise of its sovereign power, deprived of the valuable use of his property for a long period of time, is without a remedy.

This is not apposite here. The city did nothing to interfere with the appellant's projected use of his property. When the city requested a firm price, he remained silent. He was still in a position to proceed according to his plans. Again, the city notified him it was not proceeding with the proposed acquisition. When the county endeavored to procure the property, apparently the parties negotiated until a satisfactory and agreed price was reached. At that time, as with the city, appellant had a right to have the property, real and personal, and property rights, adjudicated in a trial by jury. This alternative was not sought by appellant.

Appellant also cited the three *Foster* cases in the federal courts in Michigan, *e.g. Foster v. Detroit*, 254 F. Supp. 655 (E. D. Mich. 1966). In 1950 the Detroit city council adopted a resolution freezing the use of the property in question to that city's planned use. Condemnation was started. In 1960 the condemnation action was dismissed for delays. The court finally determined that the city's unreasonable delays resulted in the depreciation of the property, and was liable for other incidental costs and expenses.

Because of these very pronounced differences, these cases are not in point in the case at bar.

The appellant also incidentally complained that the trial court wrongfully dismissed this action on a motion for summary judgment. The court said:

> The ultimate question is: Assuming the truth of the facts claimed by Plaintiff, does the plaintiff have a cause of action against the city for a taking or damaging of property for which just compensation has to be paid under the Constitution? Or, to put it in another way: Is this a case of inverse condemnation?
>
> I am satisfied, Mr. McAteer, that it is not; that there has been no taking or damaging of property here within the meaning of the law of eminent domain or any action on the part of the city that would amount to inverse condemnation.
>
> .   .   .   .

I feel, first of all, that there was no taking of the property by the city, and, secondly, I feel that, having voluntarily sold to King County, he is not in a position to pursue the city in an inverse condemnation proceeding. I feel that the city's position is well taken, at least if considered as a motion to dismiss. In other words, I am convinced that even though everything the plaintiff alleges is true, that no cause of action is stated against the City of Seattle.

What was stated in *Grays Harbor & Puget Sound Ry. v. Kauppinen*, 53 Wash. 238, 240, 101 Pac. 835 (1909), is applicable here:

Every owner of property holds it subject to the right in the public to appropriate it to a public use. However, this right in the public does not preclude the owner from improving his property, even after a survey has been made and a petition filed. It must be conceded that, at any time preceding the decree of appropriation, the party seeking to condemn, if not in possession, can abandon his proceeding.

Thus, under this rule of law, the city did not incur liability for appellant's loss arising out of his failure to complete his plans with respect to his property.

■ Nor is appellant entitled to compensation from the city for his expenses in procuring architectural and engineering services preliminarily to construction of his proposed building. This issue was met in *District of Columbia v. Lot 813 in Square 568*, 232 F. Supp. 714 (D.D.C. 1964), *aff'd*, 346 F.2d 833 (D.C. Cir. 1965); where the court stated:

In order to support defendants' contentions as to the highest and best use of the land in the reasonably near future (and therefore the fair market value to a prospective purchaser), defendants were permitted to introduce testimony as to the existence of the financial arrangements, building permits, and architectural plans, but testimony as to the cost of these development activities was excluded because these arrangements, permits, and plans were not part of the property taken by the District of Columbia and were therefore a noncompensable, consequential loss to the property owners. This ruling . . . follow[s] the appropriate case law.

Appellant would not be permitted to assert these expenses in a condemnation suit, and he should not be permitted to raise them now. The relevancy of these costs was a matter to be considered in the negotiations with King County, wherein the parties reached agreement on the fair market value of appellant's property. Any liability on the part of the city, based on negligence or contract, cannot now be asserted due to appellant's failure to file a claim for damages within the 90-day period prescribed by law.

The judgment is affirmed.

FINLEY, C. J., WEAVER, ROSELLINI, and McGOVERN, JJ., concur.