Opinion by
Judge Wilkinson,
This case arises from a Petition for Appointment of Viewers filed pursuant to Section 502(e) of the Eminent Domain Code, Act of June 22, 1964, Special Sess., P.L. 84, as amended, 26 P.S. §1-502 (e), by Cornell Industrial Electric, Inc., and Cornell Cables, Inc. (hereinafter jointly referred to as appellee). Appellee claims it is entitled to just compensation as a result of a de facto taking of its property located in the Manchester section of Pittsburgh by the Urban Redevelopment Authority of Pittsburgh (Authority). The Authority has filed preliminary objections, claiming appellee’s petition: fails to set forth any grounds which would entitle appellee to damages; fails to set forth the date or manner of the alleged taking; and fails to set forth a cause of action under the Eminent Domain Code. After a full hearing, the Court of Common Pleas of Allegheny County, by Judge O’Malley, dismissed the Authority’s preliminary objections, found the date of taking to be October 22, 1971, and appointed a Board of Viewers. The instant appeal followed.
In a very recent case involving somewhat similar circumstances in this same general area, our Supreme Court has held that a taking has occurred when the entity clothed with the power of eminent domain substantially deprives an owner of the use and enjoyment of his property. Conroy-Prugh Glass Co. v. Commonwealth, 456 Pa. 384, 321 A.2d 598 (1974). In the instant case, it is uncontested that the Authority was not clothed with the power of eminent domain until the Council of the City of Pittsburgh passed Ordinance 469 on October 22, 1970. Therefore, it is only after this date that a de facto taking could occur. However, even though we are dealing primarily with the acts of the Authority after October 22, 1970, this does not mean that actions and occurrences concerning this project prior to that date are not properly before the court below or this Court. A project of the magnitude and complexity of the Manchester Proposal requires a *604 massive amount of preliminary study, investigation, negotiation, and planning before the formal approval of the final program of redevelopment. Therefore, the evidence on the record of what occurred prior to granting the Authority the power of eminent domain is relevant to ascertain whether the cumulative effect of the Authority’s actions resulted in a de facto taking of appellee’s property.[1]
During 1969, appellee’s president, having become aware of the possible inclusion of his company’s property in the Manchester Redevelopment Project, contacted the Authority to determine how the project might affect appellee. The Authority’s director advised appellee that their property was shown in the proposed plans to be acquired in early 1971. The Authority’s chief negotiator testified he later told appellee’s president:
“A. He [meaning appellee’s property] was going to be acquired. There was no reason in the world why he wasn’t going to. It was on the map. We had the money. ... It was approved. ... It seems to me I was talking about a year [’s time].”
In fact, there doesn’t appear to be any question that appellee’s property would ultimately be acquired by the Authority under the plan.
Consistent with this expected acquisition, the Authority’s representatives also suggested to appellee that it should be prepared to relocate sometime before the acquisition. Relying on the Authority’s representatives and exercising sound business judgment, appellee began *605 to search for a suitable relocation site rather than face the possibility of having no facility to move to when its property was acquired. Shortly thereafter, appellee moved its operation to a Corlis Street location incurring a substantially higher rental cost. Meanwhile, the following events transpired reenforcing the impression that the project was to begin in earnest and that appellee’s property was about to be acquired. The Authority was selectively negotiating with owners for properties contained in the Manchester area but was unable to make offers for appellee’s property at that time because of lack of necessary HUD approval. The appellee’s property was appraised. There was attendant media coverage of the project in general and public hearings and meetings on specific facets of the plan. Various agreements between the Authority and other public bodies and government agencies were entered into and funding was applied for and granted. Various properties were amicably acquired and demolished. And Ordinance 469 was passed by the City Council vesting the Authority with the power to acquire property to be obtained pursuant to the plan (including appellee’s property) by eminent domain.
Between 1970 and 1973, appellee made various attempts to rent the subject property and was successful in two instances, although by 1972 these tenants had also vacated the premises. Subsequently, appellee received through a broker an inquiry from a prospective tenant who desired to rent the property for a five-year term. However, upon consultation with the Authority, appellee was advised that use of the property could not be guaranteed for that long a period. The property has thereafter remained vacant and has not generated any income for appellee.
Because of the vacancy of the property and the general condition of the neighborhood, extensive theft and vandalism have occurred. In 1974, because of the condition of the property, appellee was cited for violations of *606 the city building and health codes. In addition, it appears that appellee is unable to maintain insurance coverage on all the property. As the court below noted, in light of the general conditions in the area, it would be a pointless effort for appellee to search for new tenants. The imminence of acquisition, combined with the condition of the property itself and the area in general, effectively prevent appellee from leasing or selling its property. The Authority has made no offer to purchase the property, nor have they filed a declaration of taking, even though the plans still list the property as to be acquired.
It is clear that there must be exceptional circumstances present in a case to constitute a de facto taking. See Crosstown Appeal, supra. We believe that the instant case exhibits such exceptional circumstances. The record clearly supports the decision below that appellee has been deprived of the use and enjoyment of his property and is entitled to just compensation. There is little doubt that appellee’s present situation is a direct result of the Authority’s actions. Appellee’s relocation was based on the advice of Authority officials and the imminence of acquisition, not dissatisfaction with the location or facilities. This fact, combined with the general deterioration of the area resulting from the present stage of implementation of the Authority’s redevelopment plan, have destroyed any potential rental or purchase market for the property. This property is essentially useless. Appellee is left with the cost of maintaining the property, yet with no ability to make use of it or have it generate any income. We believe such a situation falls within what the courts have sustained as a de facto taking. See Conroy-Prugh, supra.
The Authority argues that it did not contribute to and cannot be held responsible for the general deteriorating social and economic condition in the area. We do not perceive this to be the precise issue involved here. There is no dispute that the neighborhood was deteriorating before the action of the Authority, and the 1968 civil dis *607 orders added to this decay. However, the present situation with this owner relative to his property did not result from the general blighted condition. The record shows appellee was making use of its property until the Authority began its redevelopment work. As late as 1971, appellee was able to use the property adequately for its own purposes, and even rented a portion of it to others. The taking came about, not as a result of the condition of the area, whatever the cause of that condition, but because of the Authority’s actions affecting this appellee’s use of its property. We believe these factors demonstrate a taking of appellee’s property and, therefore, entitle it to just compensation.
Affirmed.

. We are not unmindful of the principle that a de facto taking does not occur when property is included in the planning stage of a program. (Commonwealth Appeal, 422 Pa. 72, 221 A.2d 289 (1966)), but the factors involved in a planning stage can and must be considered when further actions in an acquisition stage have occurred that may constitute a de facto taking. Commonwealth’s Crosstown Expressway Appeal, 3 Pa. Commonwealth Ct. 1, 281 A.2d 909 (1971).