**Ida GOULD and Miriam Schafran, Plaintiffs-Appellants,**

v.

**LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF KANSAS CITY, Missouri, and City of Kansas City, Missouri, Defendants-Respondents.**

**No. WD 31195.**

Missouri Court of Appeals, Western District.

Dec. 2, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 30, 1980.

---

Stephen B. Strayer, Kansas City, for plaintiffs-appellants.

Frederick D. Ernst and Donna Stanford Skidmore, Kansas City, for defendant-respondent Land Clearance.

Aaron A. Wilson, James C. Bowers, Jr., and Kathleen Hauser, Kansas City, for defendants-respondents.

Before PRITCHARD, P. J., SWOFFORD, J., and FLANIGAN, Special Judge.

PER CURIAM:

Plaintiffs appeal from a judgment of the Jackson County Circuit Court dismissing their petition for damages against the Land Clearance for Redevelopment Authority of Kansas City, Missouri, and the City. The judgment was rendered upon the defendants' motion made at the close of all the evidence.

The theory of Count I of plaintiffs' petition was that the defendants, by including plaintiffs' eight-unit apartment house in an urban renewal project as a candidate for acquisition and demolition, and by certain actions taken by defendants in pursuance thereof, had abused the power of eminent domain and had *de facto* taken plaintiffs' property without just compensation, in violation of Article I, Section 26 of the Constitution of Missouri and of the Fifth and Fourteenth Amendments of the Constitution of the United States. A second count alleges that defendant Land Clearance, as we shall hereafter call it, promised plaintiffs that their property would be taken and purchased by the defendants for public use, thereby inducing plaintiffs to forego improvements thereon, so that the property deteriorated to plaintiffs' damage.

At the time of the trial, which commenced April 25, 1978, the defendants had not carried through with their plan to acquire plaintiffs' property. It is not clear from the evidence whether the project had been abandoned by the defendants, or whether it was still planned to acquire plaintiffs' property.

The trial court, after hearing all the evidence offered by both parties, ruled that under *Land Clearance for Redevelopment Authority v. Morrison*, 457 S.W.2d 185 (Mo. banc 1970), plaintiffs had made out no claim for relief. He therefore dismissed plaintiffs' petition and rendered judgment for the defendants. In our review of the case we search the evidence for a prima facie case. We view the evidence and the inferences to be drawn therefrom in a light most favorable to the plaintiffs, and disregard all the evidence which is contrary thereto. Our question upon this appeal is whether the evidence so viewed gives the plaintiffs any right to the relief which they claim. *Grossman Iron & Steel Co. v. Bituminous Casualty Corp.*, 558 S.W.2d 255 (Mo.App.

1977); *Young v. Mercantile Trust Co. Nat. Ass'n.*, 552 S.W.2d 247 (Mo.App.1977); *Boyle v. Colonial Life Ins. Co. of America*, 525 S.W.2d 811 (Mo.App.1975).

The facts disclosed by the evidence are as follows:

Ida Gould and her sister Miriam Schafran, the plaintiffs, owned an eight-unit apartment house at 2515-17 Cleveland in Kansas City, Missouri. They acquired it in 1953. From that time until 1967 or 1968, it was fully occupied by tenants.

In 1967 the plaintiffs received notice that the property was to be considered for urban renewal in an area called the East Twenty-third Street Urban Renewal Area. They were invited to attend a meeting of property owners in the area to be held in the Kansas City Council chambers. They attended the meeting, along with a number of other property owners in the area. They were informed at the meeting that Kansas City would get seventeen million dollars and that the East Twenty-third Street area was under consideration for an urban renewal project, and the property owners were asked to indicate whether they were in accord with the plan. The property owners present indicated, practically unanimously, that they approved the project and wanted their property to be considered for acquisition. On August 18, 1967, the City Council adopted a resolution approving the East Twenty-third Street Urban Renewal Area, and authorizing the Land Clearance for Redevelopment Authority to proceed with surveys and plan "for an urban renewal project of the character contemplated by § 110c of Title I of the Housing Act of 1949, and approving also an application for an advance of funds from the United States of America for the cost of such surveys and plans." The proposed area included plaintiffs' property just within the western boundary thereof.

On January 17, 1969, the City Council adopted an ordinance approving a general urban renewal plan for each of six urban renewal areas, including the East Twenty-third Street area. The plan so approved was dated November 25, 1968. The ordinance authorized the Land Clearance for Redevelopment Authority to file an application for financial assistance, or the "annual increment" thereof, to proceed with the plan.

Mrs. Gould testified that Mr. Henry Savwoir, an employee of defendant Land Clearance, "came over and we went through the building, each apartment, and he told me that I will be contacted by somebody and that I was definitely going to be acquired, and that I am doing all right now, and he would suggest that I don't put any money into the building because it's going to be the taxpayers' money if I put in money to do anything in any improvements or any big repair jobs it will cost—they would have to pay me more than the building is worth now, and that would cost the taxpayers money and it wouldn't be right for me to do that." The time of the initial contact by Mr. Savwoir is not fixed, but his employment began in March, 1969, and continued till November of that year, then from October, 1971, to time of trial. We take it his conversations with Mrs. Gould' commenced in 1969. Mrs. Gould said that she talked with Mr. Savwoir many, many times, who repeatedly told her "not to make any improvements", and assured her that "you are going to be acquired."

Mr. Brown of defendant Land Clearance inspected the building and estimated it would take more than $30,000 to rehabilitate the property, Mrs. Gould testified. He said he didn't feel it was worth it and said he would recommend that they acquire the building and level it. Presumably this was in 1969 or 1970.

An "informational statement" was distributed to property owners in the East Twenty-third Street area, including Mrs. Gould, on December 30, 1970. The statement consisted of two legal-sized mimeographed pages. It advised the property owners that on November 23, 1970, the Redevelopment Authority of Kansas City, Missouri, had adopted the urban renewal plan for the East Twenty-third Street area; that the renewal plan had been approved by the City Plan Commission on December 3, 1970;

and that a public hearing would be held before the City Council January 7, 1971. The notice showed Mrs. Gould's property to be in the "acquisition with option to rehabilitate" category, which meant that "inspections have indicated that economic rehabilitation of the building is highly doubtful. If, however, the owner is willing and able to bring the property up to the 'property rehabilitation standards' for the area, the Authority has the power to remove the property from the acquisition list, and place it on the 'to be rehabilitated' list."

The notice further stated that the rehabilitation project for the Twenty-third Street area involved over 4,000 individual properties of which approximately 580 would be acquired and cleared by the Authority. It stated that, "In a great majority of cases, however (over 85%), it was found that the buildings located on the properties were in a standard 'good to excellent' condition, or were in a fair condition capable of being economically rehabilitated."

The notice went ahead to say that "due to the large number of properties involved, and the fact that the East Twenty-third Street area is only one of many projects currently being carried out by the Authority, the land acquisition activities must necessarily be spread out over a period of several years' time." It indicated that land purchases would begin about June 1, 1971, although it could not be predicted which or how many parcels could be acquired during the first year. "In any event", it continued, "until such time as an offer to purchase is actually made by the Authority, a property owner is free to buy, sell, or use his property in any manner permitted by normal City regulations (the Zoning Ordinance Building Code, and enforcement of the City's Dangerous Buildings Ordinance). It is recommended, however, that any improvements generally be kept to a minimum. You will, of course, need to comply with City Code requirements and take care of normal maintenance, but we would suggest that you not undertake extensive improvements."

Mrs. Gould said that she had been told throughout the period beginning in 1967 that the acquisition of her property was imminent. She tried to keep up the building. Prospective tenants who were moving out of other buildings in the area which were being acquired by the Authority were discouraged by a Mrs. Henderson, whom Mrs. Gould described as a Relocation Agent, from moving to Mrs. Gould's property. Mrs. Henderson's connection with defendant City or defendant Land Clearance, if any, is not shown. Apparently the displaced tenants were receiving $300 to $400 relocation assistance, but Mrs. Henderson would not approve the payment to move into Mrs. Gould's property since it, too, was scheduled to be acquired. Mrs. Gould actually mentioned only one prospective tenant whom she lost on this account. Mrs. Gould said she got to the point where she couldn't get a decent tenant and didn't know where she stood. In July, 1970, she went to see Mr. Seibold, area director of the Renewal Area, at the area office in the Argyle Building. Mr. Seibold assured her that her building was going to be acquired. She asked Mr. Siebold to give her a letter which she could show to her tenants. Her idea was that she could thereby induce them to stay on as her tenants until the building was acquired, when they could obtain relocation assistance to move out. Mr. Seibold gave her a letter, dated July 27, 1970, addressed to Mrs. Gould, which said: "This is to inform you that this office is recommending to our planning department that the structure located at 2515–17 Cleveland be purchased for the purpose of demolition as part of the urban renewal program of East Twenty-third Street."

Mrs. Gould said that her property needed certain improvements, including a new driveway, replacement of certain wood siding, although the building was mainly of brick, and a new roof. Representatives of the Authority cautioned her to make no expensive improvement, but rather "just keep it up".

The rate of occupancy and the quality of tenants began to decline. Exactly when this began Mrs. Gould did not say, but in

1973 through 1975 from four to six of the eight apartments were occupied. In 1976 the number was down from two to four. In January of 1977 the last two tenants moved out. Mrs. Gould boarded it up and had the utilities shut off. A month or so later thieves stole the radiators and bathtubs. Mrs. Gould thought the property was worth from $30,000 to $35,000 before the initial contact by the Land Clearance Authority and at the time of trial it was worth nothing.

Other facts will be related later in the opinion.

Mrs. Gould's co-tenant, Miriam Schafran, was a resident of New York and did not testify.

We agree with the trial court that the case is ruled by *Land Clearance for Redevelopment Authority v. Morrison, supra,* and we are bound by that decision to affirm the judgment of the trial court.

In *Morrison,* which also grew out of an urban renewal project, the Land Clearance for Redevelopment Authority of St. Louis, and the City of St. Louis, followed the same general procedure as in the present case. In fact, Land Clearance in *Morrison* went beyond what Land Clearance did in the present case in that it actually contacted the owners' tenants, encouraged them to move, and found quarters for them to move to—although the time lapse from the adoption of the ordinance approving the urban renewal plan was shorter in *Morrison* than in the present case.[1]

Plaintiffs cite for their position the following Ohio and Michigan cases which hold the condemning authority responsible in damages for deterioration in value of property, before its actual *de jure* taking, as a result of its being slated for acquisition in a public improvement project: *Foster v. City of Detroit,* 254 F.Supp. 655 (E.D.Mich.1966); *Sayre v. United States and the City of Cleveland,* 282 F.Supp. 175 (N.D.Ohio 1967); and *City of Detroit v. Cassese,* 376 Mich. 311, 136 N.W.2d 896 (1965). Plaintiffs point

out, and correctly so, that the *Morrison* decision did not expressly disapprove the Ohio and Michigan cases. The decision instead distinguished the *Morrison* facts from those which obtained in those cases. The court used this language:

"As we stated above, this is not a situation of aggravated delay or untoward activity on the part of the Authority such as has been found to have constituted a taking in the Michigan and Ohio cases. If such cases arise in Missouri, they will be dealt with on their facts ..." 457 S.W.2d at 199.

■ As in *Morrison,* we are of the opinion that the proof adduced by plaintiffs in the present case does not bring them within the Ohio and Michigan cases. The proof here does not show the condemning authority's "untoward activity" or "aggravated delay" as in those cases.

Plaintiffs emphasize that defendant Land Clearance discouraged substantial expenditures for improvements. However, their evidence shows also that normal maintenance, to maintain the apartment building in "as is" condition, and to comply with the Property Maintenance Code, were advised. Much of the decline in value of plaintiffs' property can be laid to her failure to maintain it. This will become clear from the evidence cited later in the opinion in connection with citations for Property Maintenance Code violations.

Actually improvements were only counseled against and were not forbidden. The basis for the advice was that improvements would increase the cost of the property to the taxpayer. Whether in the absence of such advice plaintiffs would have made the improvements Mrs. Gould mentioned—a new driveway, new roof, and replacement of clapboard—there is no way to know. The economic feasibility of improvements at any time after 1967, regardless of the prospect of condemnation, would have been extremely doubtful. There is no evidence

1. In *Morrison,* the ordinance approving the plan was adopted December 28, 1964. Condemnation proceedings were commenced April 21, 1966. How long the project was in the planning stage before the adoption of the ordinance is not shown by the opinion.

that defendant City had any policy of obstructing such improvements, as in *Foster v. City of Detroit, supra,* where building permits were granted applicants only upon their waiving any claim to the increased value of the property as a result of the improvement (254 F.Supp. at 662). Nor was Mrs. Gould informed, as in *Foster,* that she would receive no compensation for improvements (*Id.* at 662).

There was no *lis pendens* filed against plaintiffs' property as in *Foster,* where the *lis pendens* was left in effect for five years after the Public Housing Authority had issued a stop order on the project. The court said in *Foster* there was evidence that the *lis pendens* impaired sales of property, thus reducing sales prices and values (*Id.* at 662).

There is no evidence to indicate that plaintiffs' apartment building had been left standing solitary in a desert of cleared and vacant land, as was the case in *Cleveland v. Carcione,* 118 Ohio App. 525, 190 N.E.2d 52, 5 A.L.R.3d 891 (1963). In the acquisition map of the project of 23 improved parcels in the block where plaintiffs' property is located, it is one of four marked for acquisition. At the time of trial only 190 properties had been acquired in the entire East Twenty-third Street Urban Renewal Area, out of a total of 580 planned to be acquired. It is clear that the plaintiffs' property was not isolated as was that of the property owner in the *Carcione* case, where 545 buildings had been demolished out of a total of 584.

Neither of the defendants directly contacted plaintiffs' tenants advising them of the project and causing them to vacate plaintiffs' property, as was the case in *Sayre, supra,* at 182. The renewal plan was publicized in the news media, according to plaintiffs' evidence, and perhaps the tenants knew of it. Whether they knew that plaintiffs' property was slated for acquisition is not at all clear, nor is it clear that the pendency of the plan itself caused any of the tenants to move. After all, only 15% of the structures in the area—one out of seven—were slated for acquisition. There is no evidence that the tenants knew that plaintiffs' property was among those scheduled for acquisition and demolition, nor that this information caused them to move from plaintiffs' apartments or caused prospective tenants to shun them.

In 1972 and afterwards citations were issued to plaintiffs for violations of the Property Maintenance Code, but there is no showing that there was anything intense or unusual about the City's inspections or the enforcement of its Property Maintenance Code, a factor mentioned in *Detroit v. Cassese, supra,* 136 N.W.2d at 900, as a value-depressing activity of the condemning authority. The notices sent to Mrs. Gould required—in addition to other repairs—such actions as cleaning up accumulations of trash, extermination of rats, roaches and pigeons, replacing or boarding up broken windows, and repairing eaves which were broken and hanging down at various places on the building. The advice of representatives of Land Clearance, when Mrs. Gould would call them about these notices, was to comply with the requirements. The "Informational Statement" of December 30, 1970, to which we have referred earlier, also stated that property owners were not relieved of the obligations of the Property Maintenance Code. This lack of day-to-day maintenance seems to have been the main contributing factor in the loss of value of plaintiffs' property.

At first blush, the time lapse—from the adoption of the first City Council resolution on August 18, 1967, to the time of trial, April 25, 1978—does seem extraordinary. A closer look, however, fails to reveal any culpability on the part of the defendants.

The East Twenty-third Street project was a huge one, involving over 4,000 individual properties, approximately 580 of which were to be acquired and cleared by Land Clearance. The East Twenty-third Street area was only one of 16 urban renewal projects authorized by the ordinance of January 17, 1969. There is no evidence from which the trial court, or we, could conclude that three and a half years was an excessive length of time for the plans and surveys which culminated in the approval of

the plan by the City Council on January 7, 1971.

We gather from the evidence that the rapid decline in Mrs. Gould's property actually did not commence before January 7, 1971, during the plans and surveys period. It commenced rather after January 7, 1971, a date which we may use as a starting point. Until that date, when the detailed plans were approved by the City Council, the project had remained in the pupal stage. The first year for which Mrs. Gould testified to a sharp reduction in rentals was 1972. That year the gross rentals were $3,384, compared to 1969, the last previous year to which she testified, when the gross rentals had been $4,225.78. From 1972 on, it was all downhill. By 1976, the gross rentals were $590. In January, 1977, the last two tenants moved out. She boarded up the windows and turned off the utilities. A month later thieves stole the plumbing fixtures and the radiators. Mrs. Gould testified that the property at the time of trial had no value.

The evidence does not tell us what had happened to the improvement project in the meantime. A stipulation of the parties tells us that a total of 190 properties had been acquired by Land Clearance at the time of trial. We are told also that federal funds for the project were impounded on January 7, 1974. Whether the funds were later released and the project resumed we do not know. In any case, it was understood by all from the beginning that the properties would be purchased over a period of years as funds, principally federal funds, became available. There is no evidence that the defendants were arbitrary or discriminatory in the selection of other properties to purchase before plaintiffs' property. We cannot say, in view of the magnitude of the project, that the defendants can be charged with foot-dragging. Given the fact that the acquisition of all the buildings and the completion of the project was unavoidably a protracted process, there is no proof of any actions of defendants which was not consistent with correct, lawful and orderly procedure.

We have noted two other cases cited by plaintiffs. One is *Drakes Bay Land Company v. United States*, 424 F.2d 574, 191 Ct.Cl. 389, (1970), where the condemning authority took affirmative measures to frustrate plaintiff's subdivision of its land, and where it refused reasonable means, available to it by statute, to acquire plaintiff's land. There are gross differences between that case and the one before us.

The second case, *Washington Market Enterprises, Inc., v. City of Trenton*, 68 N.J. 107, 343 A.2d 408 (1975), is not authority for the plaintiffs' position. There the court held that the plaintiff would be entitled to damages if he could show that "there has been substantial destruction of the value of its [plaintiff's] property and that defendant's activities have been a substantial factor in bringing this about." *Id.* 343 A.2d at 416. Plaintiffs' proof here fails to show prima facie that the defendants' activities substantially contributed to the substantial destruction of the value of the property of plaintiffs. If plaintiffs' evidence did make a prima facie case under the *Washington Market Enterprises* case, we would then be faced with the question whether we should follow the reasoning of that case, or whether we should decline to follow it because inconsistent with the *Morrison* decision.

The following language from *City of Buffalo v. J. W. Clement Company*, 28 N.Y.2d 241, 321 N.Y.S.2d 345, 356, 269 N.E.2d 895, 903 (Ct.App.1971), is appropriate to the present case:

"The facts herein fail to disclose any act upon the part of the condemning authority which could possibly be construed as an assertion of dominion and control. Indeed, it cannot be said that the city, by its actions, either directly or indirectly deprived Clement of its possession, enjoyment or use of the subject property. We simply have a manifestation of an intent to condemn and such, even considering the protracted delay attending final appropriation, cannot cast the municipality in liability upon the theory of a 'taking' for there was no appropriation of the property in its accepted legal sense. As

the Supreme Court has held: 'A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a "taking" in the constitutional sense.' (*Danforth v. United States*, 308 U.S. 271, 285, 60 S.Ct. 231, 236, 84 L.Ed. 240). This reasoning, it may be added, has been applied time and time again to deny compensation based upon the asserted theory that the threat of condemnation constitutes an actual taking (citations omitted), and the rule has evolved in this State denying direct recovery for the manifestation of an intent to take or threat to condemn (citations omitted).

"Moreover, strong public policy considerations prohibit a finding of a *de facto* taking in the instant case. To hold the date of the *announcement* of the impending condemnation, whether directly to the condemnee or by the news media, constitutes a *de facto* taking at that time, would be to impose an 'oppressive' and 'unwarranted' burden upon the condemning authority. At the very least, it would serve to penalize the condemnor for providing appropriate advance notice to a property owner. And to so impede the actions of the municipality in preparing and publicizing plans for the good of the community, would be to encourage a converse policy of secrecy which 'would but raise [greater] havoc with an owner's rights'." (Citations omitted.)

Plaintiffs say in their brief that, if they made no case against the defendants on the theory of a *de facto* taking of their property, or on the theory of an abuse by the defendants of the powers of eminent domain, that they made a case on the theory of "promissory estoppel" or "detrimental reliance". They cite for that proposition the case of *In re Jamison's Estate*, 202 S.W.2d 879 (Mo.1947). Defendants answer that a claim against a municipal corporation cannot be made upon the theory of "promissory estoppel" or "detrimental reliance." We do not need to reach the question posed by defendants' argument, however, for it is clear that a landowner cannot in the circumstances of the case before us rely upon any expressed purpose or statement of intention of the condemning authority to acquire his property. *Hamer v. State Highway Commission*, 304 S.W.2d 869, 872, 873 (Mo.1957).

The judgment is affirmed.