**CITY OF BROOKINGS, a Municipal Corporation, Plaintiff and Appellant,**

**v.**

**Harvey E. MILLS and Mary Lou Mills, Defendants and Appellees.**

**No. 15562.**

Supreme Court of South Dakota.

Considered on Briefs May 20, 1987.

Decided Sept. 16, 1987.

Alan F. Glover of Denholm & Glover, Brookings, for plaintiff and appellant.

Richard J. Helsper of Erickson & Helsper, P.C., Brookings, for defendants and appellees.

SABERS, Justice.

The City of Brookings (City) appeals the trial court's decision of "de facto taking" and awarding delay damages. We reverse.

*Facts*

Harvey E. and Mary Lou Mills (Mills) purchased the subject property in 1963. This real estate, which consisted of approximately 10.9 acres, was located adjacent to City's municipal airport; 2.35 acres of which was included in an aviation easement that restricted its use as a safety zone for the airport. The property was zoned light industrial and Mills bought it for long-range commercial development. Mills planned to construct four industrial steel buildings on a speculative basis to offer to potential lessees.

With this plan in mind, Mills contacted the City Engineer in December 1976, to apply for a building permit. It was Mills' intention to begin construction in January of 1977. Noting the aviation easement, the City Engineer advised Mills to first obtain permission from the FAA. On December 2, 1976, Mills applied to the FAA for permission to build in the area of the easement. The FAA responded in late January of 1977, indicating its approval of the proposed development plan but also indicating that Mills' proposed construction might conflict with the City's plans to expand the airport.

Following receipt of the FAA permit, Mills returned to the City Engineer in February 1977, who informed him for the first time of the City's plans for airport expansion which targeted Mills' property for acquisition. Based on this conversation, Mills chose not to file the application because he believed the City intended to take the property which made his plans to develop it futile.

The City's consulting engineering firm submitted a proposed land use map for the airport expansion project to City's Planning Commission on June 21, 1977. Upon receipt, the City adopted the overall plan which included Mills' property for acquisition. In March of 1978, the consulting engineers submitted a completed airport master plan which City approved and submitted to the State Aeronautics Board and the FAA for approval. On September 5, 1978, the City adopted Resolution No. 1954 which authorized acceptance of the airport development aid grant from the federal government, thereby putting into place the necessary financing for the airport expansion project.

In December 1978, the City contracted with an appraiser to conduct appraisals of the land affected by the project and targeted for acquisition. The targeted area included Mills' property among its approximately seventeen or eighteen parcels of land for appraisal. In January 1979, the City received final approval for the project.

On February 8, 1979, the City gave Mills formal notice of its intent to acquire his property and advised him that the appraiser would be contacting him. On April 30, 1979, the appraiser submitted his appraisal of Mills' property to the City. He appraised the land at $6,300 per acre for 8.56 acres for a total of $54,000. This was a mistake as the appraiser was operating under the belief that Mills owned only 8.56 acres when he in fact owned 10.9 acres.

In September 1979, the City offered Mills $54,000 for the property. Mills did not inform the City until May of 1980 that the appraisal was erroneous on both the amount and computation of acreage. In August 1980, the City offered Mills $76,300

which valued the land at $7,000 per acre and included a 5% increase as an adjustment for appreciation and time.

In February of 1981, Mills rejected the City's offer and offered to settle for $100,000. He informed the City that if this proposal was not satisfactory, he would seek court action. In July 1981, Mills requested the City to either condemn his property or allow its development.

On July 28, 1981, the City initiated a condemnation action against Mills which sought to acquire his property for $76,300. Mills filed a counterclaim against the City alleging a "de facto taking" of his property which entitled him to an award of damages. The City moved for summary judgment on the counterclaim which was denied. The trial court bifurcated the proceedings which allowed the City to proceed with its condemnation action.

Following a jury trial on January 28–29, 1982, the jury awarded Mills the sum of $95,375 (or $8,750 per acre) for his property, from which he appealed. This court affirmed the jury verdict in a per curiam opinion. *See City of Brookings v. Mills*, 337 N.W.2d 181 (S.D.1983). The judgment has been satisfied.

Thereafter, the parties proceeded to litigate the counterclaim in a court trial on March 28, 1985. On September 9, 1986, the trial court entered findings, conclusions, and a judgment which awarded Mills $59,536 in damages for the City's de facto taking of his property prior to formal condemnation. The court concluded that the City effectively deprived Mills of the use of the property and failed to properly compensate him for such deprivation for a period of four and one-half years. The City appeals to this court.

### City's Claims

The City claims that its conduct did not amount to a de facto taking of Mills' property and that the trial court erred in computing the delay damages.

### A "DE FACTO TAKING"

Mills contends that he suffered numerous losses from the City's delay in excess of four years in condemning his 10.9 acres. These losses included: a decrease in land value, loss of the use and enjoyment of the property for its intended purpose, loss of the use of the money, and loss of income from the development of the property. The City contends that: it did not abuse its powers of eminent domain. Mills was never informed in February of 1977 that he could not file an application for a building permit, it was Mills' own business decision not to file, and that any delays were caused by the nature of the bureaucratic process rather than the City's conduct.

A landowner whose property is taken for public use, *or damaged,* is entitled to just compensation. S.D. Const. art. VI, § 13. This section, which allows the landowner compensation whenever his property rights are damaged, expanded the traditional rule allowing compensation only when the property was physically taken in condemnation proceedings. *Hurley v. State*, 82 S.D. 156, 160–161, 143 N.W.2d 722, 725 (1966). Therefore, the concept of inverse condemnation provides landowners with compensation when the government takes private property without formal condemnation proceedings. 27 Am.Jur.2d *Eminent Domain*, § 478 (1966).

▉ The time that compensation is to be determined is the date of the taking or damaging, or the substantial interference with the owner's rights. *Hurley v. State*, 81 S.D. 318, 323, 134 N.W.2d 782, 784–785 (1965).* The measure of damages for the substantial impairment of the owner's

---

* Generally, the "date of take" on which the value of property appropriated for public use is determined is the earlier of either the date of trial or the date of actual physical appropriation [Citations omitted]. An exception to this was recognized[.] ...

Thus, the court may establish an earlier date of take if depreciation is caused by the actions or inactions of the appropriating authority. The burden of proof necessarily lies with the property owner to show causation. 2 P. Nichols, *The Law of Eminent Domain* § 6.01[2] (1987 Supp.), *citing Evans v. Hope*, 12 Ohio St.3d 119, 465 N.E.2d 869 (1984).

rights is the difference between the market value of the property considered at its highest, best, and most profitable use immediately before and immediately after the destruction or impairment. *Hurley, supra,* 82 S.D. at 164, 143 N.W.2d at 726.

Although the concept of a "de facto taking" as justification for delay damages is one of first impression in South Dakota, both Pennsylvania and Michigan courts have considered this issue. The Pennsylvania courts have concentrated their inquiry on significant facts and the existence of exceptional circumstances. Under the Pennsylvania standard, the inquiry is:

1) Is condemnation *inevitable?*

2) Has the property suffered a *substantial loss of ability to generate income* and *substantial loss of marketability?*

3) Was the loss in income generation and marketability a *proximate result of* the *government's actions?*

4) Is the *landowner facing a threatened loss of the property* due to the property's inability to generate sufficient income to pay taxes and/or operating expenses?

An affirmative answer to the fourth question is not required in order to find that a taking has occurred, but the existence of such a threatened loss is a significant fact indicating a taking. The burden of proof is on the claimant to establish the elements of a de facto taking. *Gamma Swim Club, Inc. v. Com., Dept. of Transp.,* 95 Pa. Cmwlth. 167, 505 A.2d 342 (1986); *Visco v. Com., Dept. of Transp.,* 92 Pa.Cmwlth. 102, 498 A.2d 984 (1985); *In re Condemnation of Premises, Etc.,* 68 Pa.Cmwlth. 506, 449 A.2d 820 (1982); *Com., Dept. of Transp. v. Lawton,* 50 Pa.Cmwlth. 144, 412 A.2d 214 (1980); *Petition of Cornell Industrial Electric, Inc.,* 19 Pa.Cmwlth. 599, 338 A.2d 752 (1975); *Conroy-Prugh Glass Co. v. Commonwealth, Dept. of Transp.,* 456 Pa. 384, 321 A.2d 598 (1974).

The Michigan courts have framed the test somewhat differently, but the key elements of proof are substantially the same:

[A] plaintiff must establish (1) 'that the government's actions were a *substantial cause* of the decline of his property's value', and (2) 'that the government abused its legitimate powers in *affirmative actions* directly aimed at the plaintiff's property'. (citation omitted) (emphasis added.)

*Attorney General v. Ankersen,* 148 Mich. App. 524, 561, 385 N.W.2d 658, 675 (1986).

Both "tests" incorporate the general elements of proof of governmental action, causation and result.

*Governmental Action*

It is well settled in both Michigan and Pennsylvania that legitimate action by government pursuant to public improvements, absent exceptional circumstances, is insufficient to establish a de facto taking.

Recognizing the need to balance the flexibility of planning agencies with that of the property owner, our courts have concluded that the recording of final plans, newspaper articles, agency announcements, plans awaiting the Governor's approval, negotiations with owners, real estate appraisal, and rumors are not sufficient to constitute a de facto taking.

*In re Condemnation of Property in Homer City,* 519 A.2d 1065, 1068 (Pa.Cmwlth. 1987).

The Michigan courts have noted that, in reviewing the government's actions, a court must examine "both the intensity and form of the accompanying publicity and the deliberateness of specific actions directed at a particular plaintiff's property . . . to reduce its value." *Heinrich v. City of Detroit,* 90 Mich.App. 692, 698, 282 N.W.2d 448, 450 (1979).

The trial court cited the cases of *In re Elmwood Park Project Section 1, Group B,* 376 Mich. 311, 136 N.W.2d 896 (1965), *Board of Ed., City of Detroit v. Clarke,* 89 Mich.App. 504, 280 N.W.2d 574 (1979), and *Petition of Cornell Industrial Electric, supra,* in concluding that the activities of the City constituted a taking of Mills' property.

In *Elmwood Park, supra,* the City had informed the landowner by letter in 1950 of the condemnation. Thereafter, a condemnation suit was commenced and lis pendens

filed. Ten years later, in 1960, the suit was discontinued and the planned project abandoned. A second condemnation action was begun two years later and the landowner claimed a de facto taking by the City in 1950. Above and beyond the delay of over ten years, the landowner claimed the City had engaged in numerous other deliberate actions including sending letters to tenants and occupants encouraging them to move out; the filing of lis pendens; refusing to issue building permits; reducing city garbage, police, and street repair and cleaning services; and intense building inspections. These actions were weighed by the court in its review of "proof of calculated action or specific directives by city officials for the purpose of reducing the value of [defendant's] propert[y]." *Id.* 136 N.W.2d at 900.

The Urban Redevelopment Authority in *Petition of Cornell Industrial Electric, supra* informally told the defendant landowner in 1969 that its land would be acquired and suggested that it should be prepared to relocate prior to 1971. Cornell Industries did relocate soon after. Although some surrounding properties were acquired, the subject property appraised, public hearings held, and funding acquired, no offer was made to Cornell. Cornell attempted to rent the property in 1970 and 1973, but no tenants were acquired after 1972 and the property remained vacant. Subsequently, there was extensive theft and vandalism. Cornell was cited for health and building code violations in 1974. The court found a taking had occurred in that the beneficial use of this commercial property, i.e., its income-generating ability, had been destroyed during the five-year delay.

In *City of Detroit v. Clarke, supra,* the landowner was aware of the proposed project in 1962. He was told his land would soon be acquired in 1965. By 1970, the landowner was having difficulty acquiring tenants and in 1972 he was informed that his land was outside the project and would not be acquired. The building located on the land was boarded up and demolished in 1973. Besides the seven to ten-year delay, the court found other deliberate action by the City which could be "considered as depriving an owner of his property rights:" deliberate filing of lis pendens; published threat of condemnation; mailing letters and circulars concerning the project to area residents; refusing to issue building permits for improvements coupled with intense building violation inspection; reductions in city services; and piecemeal condemnation and razing. *Id.* 280 N.W.2d at 576. It is important to note that neither property was ever acquired in either of these last two cases.

■ These cases make it clear that the plaintiff in an inverse condemnation action must prove direct and substantial action by the government. The evidence of government action presented to the trial court in this case shows that the City began the necessary preliminary steps in its expansion plan in early 1977 and made its first offer to Mills in September 1979. This period of time does not appear to be unreasonable, particularly when compared to the five, ten, and twelve-year delays found in the cases cited by the trial court.

The alleged delay in *Gould v. Land Clearance for Redevelopment Authority of Kansas City,* 610 S.W.2d 360 (Mo.App. 1980), is closer to the alleged delay in the instant case. The court stated: "At first blush, the time lapse ... [of 3½ years] does seem extraordinary. A closer look, however, fails to reveal any culpability on the part of the defendants." *Id.* at 365. The project involved was massive and entailed the acquisition of numerous properties. However, the court was persuaded that there was no evidence that the planning and surveying time was excessive.

■ The timing aspect of a de facto taking is determined by the inevitability of condemnation. The property owner is required to prove by substantial evidence that a formal condemnation of his land was inevitable. *Com., Dept. of Transp. v. Kemp,* 515 A.2d 68, 72 (Pa.Cmwlth.1986). In the absence of imminent condemnation, the landowner may show a de facto taking through exceptional circumstances which deprived him of the beneficial use and enjoyment of his property. *Id.* At trial,

Mills contended that his property was taken by the City in early 1977—the point at which he learned of the City's proposed airport expansion. No finding of fact of the trial court established the time when the inevitability of condemnation came into existence. A date of taking was impliedly established through the calculation of damages by the expert witness and then approved by the court. In the alternative, Mills must prove the deprivation of beneficial use and enjoyment of his property. Pennsylvania cases involving commercial property have found evidence of loss in value and the inability to rent or sell the property to be relevant evidence of loss of commercial use. *Kemp, supra.* Here, evidence was presented that the land *appreciated* in value during the four years involved. In fact, evidence was elicited that the land could have continued to generate income from rental for agricultural use, as it had in the past. The present use of property is presumed to be its highest and best use and the burden of proof is on the property owner to show adaptability to and need for another use. *Kemp, supra, citing Visco, supra.*

As bearing upon these issues, the owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, provided it appears that the likelihood of demand for the property for that purpose is *such as to affect market value.* He cannot, however, go further and describe in detail to the jury a speculative enterprise for which in his opinion (or that of some expert) the land might be used, and base his estimate of value upon the profits which he would expect to derive from the enterprise. In other words, he *cannot capitalize the projected earnings of a non-existent enterprise or projected use.* (emphasis added.)

5 P. Nichols, *The Law of Eminent Domain* § 18.11[2] (3d ed. rev. 1985) (footnotes omitted). This is essentially the basis of the "delay damages" relied upon in this case.

■ Although evidence was presented as to Mills' proposed alternative use (commercial development), the issue of loss of use was never directly addressed. The facts of the Pennsylvania line of cases clearly establish that where loss of use is asserted, the evidence must be *substantial* and *any* beneficial use accruing to the property owner will tend to defeat the assertion. *See In re Condemnation of Premises, supra* (no deprivation of use and enjoyment where homeowners either lived in or rented property); *Gamma Swim Club, supra,* (mere decline in fair market value because of imminence of condemnation without more evidence indicative of loss of use is insufficient); *Visco, supra,* (no taking where property still utilized for present use and property owner's evidence related more to diminution in value than loss of use).

The cases cited by the trial court in concluding that the City's activities amounted to a de facto taking of Mills' land are founded upon substantially different facts. The courts in those cases found direct abuses by the government, such as extensive publicity aimed at encouraging tenants and occupants to move, reductions in city services and the filing of lis pendens. Although the refusal to issue building permits is another example of such abusive actions, there was no refusal to issue a permit here as no application for a permit was ever made.

### Causation

Even where abuses by the government can be established, a causal connection must be drawn between the government's actions and an individual's alleged loss: "[t]he actions of the defendant ... [must] *substantially contribute* [ ] *to* and accelerate[ ] the decline in value of plaintiff's property." (emphasis in original). *Heinrich, supra,* 90 Mich.App. at 700, 282 N.W.2d at 451, *citing Foster v. Detroit,* 254 F.Supp. 655, 665 (E.D.Mich.1966).

Mills' counterclaim alleges the denial of his request for development permits without condemnation or payment constitutes a taking entitling him to compensation. However, evidence presented at the trial clearly established that the City never denied Mills a permit because he never

applied for one. Although Mills attempted to prove he did not apply for a permit because he knew from the City Engineer it would be futile, he also stated that his decision not to "fight City Hall" was a business judgment based on his desire to continue cooperating with the City.

In *Howell Plaza, Inc. v. State Highway Com'n*, 92 Wis.2d 74, 284 N.W.2d 887 (1979), the corporation bought sixty acres of commercial property in 1959 and proceeded to develop ten to eleven acres. The president of the corporation became aware in 1968 of a proposed highway project which would take about sixteen acres of the undeveloped land. The project was approved by federal authorities in July 1970, and the affected land was informally approved for early acquisition in August 1971. The corporate president was informed that all acquisition plans were being terminated in January 1973. The corporation sued, alleging a de facto taking. The corporation claimed that it had been unable to develop its land, had lost potential tenants, and had been told by the city planning director that it would be unable to obtain a building permit. The court noted that the corporation's president had never actually applied for a building permit. Though he had implied that he had no choice but to act cooperatively with the city, the court affirmed the trial court's finding that development had been voluntarily withheld: "Because petitioner made no attempt to develop or sell its land, the trial court could rightfully conclude the petitioner was not deprived of all or substantially all of the property's beneficial use." *Id.* 284 N.W.2d at 892.

While evidence of coercion would be a substantial factor in evaluating causation, the City cannot be required to take responsibility for voluntary judgment decisions made by persons affected by its actions. Much time was spent in the trial court speculating on what might have happened had Mills applied for a building permit. Speculation, however, is not fact. There simply is no evidence in the record to establish that any action by the City caused the alleged result.

*Result*

As noted previously, the Pennsylvania courts define the required result to be "a substantial loss of ability to generate income and substantial loss of marketability," while the Michigan courts refer to "the decline of his property's value." Mills' property fails to meet either test. No evidence was presented below that Mills' property was incapable of generating income. It had been utilized previously for agricultural purposes and no reason was given why such a use could not be continued, except that Mills intended to develop it, not farm it. It was unclear whether such leasing had actually continued.

As Mills presented no evidence that he had attempted to sell and no substantial evidence that he had attempted to rent the property, there was no evidence to show that the property could not have been sold or leased. Another method of viewing damage was suggested in *In re Condemnation of Premises, supra.* The court noted that the property involved was not at the point where, if condemnation were not pursued, the property could not again achieve the status of being desirable for rental or purchase. Had no condemnation occurred, Mills' property in 1981 would have had the same use and potential it possessed in 1977, negating any claim of lost benefit.

Finally, it is important to note that the landowner here is, essentially, asking to be compensated for a lost opportunity or, at best, a lost expectancy. There is no showing here that the City prevented this "lost opportunity" from being pursued elsewhere on either leased or owned property. As indicated above, Mills *was* compensated for the increased value of his property in 1982. In addition, the length of time from start to finish of the informal condemnation proceeding was not unusually long. Much of the delay was caused by Mills, not by the City. The condemnation lawsuit was started by the City within one month of Mills' demand. The chilling effect which

a finding of liability would have on local government planning should not be overlooked. The caselaw from other jurisdictions on de facto taking clearly demonstrates efforts to carefully balance private rights with public needs. Our effort results in a conclusion of no liability, because we find that Mills failed to sustain the burden of proof in presenting substantial evidence on any of the necessary elements.

Accordingly, we reverse on liability and do not address the questions relating to delay damages and their computation.

All the Justices concur.